|  |  |  |
|---|---|---|
| TUCKERBROOK ALTERNATIVE INVESTMENTS, LP, Plaintiff & Counterclaim Defendant | ) ) ) ) | |
| v. | ) | Case No. 1:12-cv-11643 |
| SUMANTA BANERJEE, Defendant & Counterclaim Plaintiff | ) ) ) | |

**DEFENDANT'S ANSWER AND COUNTERCLAIM TO THE COMPLAINT**

Defendant Sumanta Banerjee ("Banerjee"), hereby submits his Answer and Counterclaims to the correspondingly numbered paragraphs of plaintiff Tuckerbrook Alternative Investments, LP's ("Tuckerbrook") Complaint ("Complaint") as follows:

**INTRODUCTION**

Further answering, the official names of the hedge funds referred to in this section of the Complaint are TAI|SB Global Distressed Fund ("GDF") and TAI|SB Global Special Situations Fund ("GSS") (collectively the "Funds"), and Banerjee was a 50% managing member/owner of the General Partner of the Funds. Additionally, Mr. John J. Hassett ("Hassett") is a director of Tuckerbrook; Mssrs, Jeff Landle (CIO, The Hardt Group) and Turner Smith (Landmark Advisors) were Directors/Board Members of Tuckerbrook at the time that the events of this case took place. They, collectively, played a role in all of Tuckerbrook actions and dealings. Non-party Albert and Margaret Alkek Foundation ("Alkek") is a non-profit organization with its principal place of business in Houston, TX. They are relevant parties to this matter and litigation.

1. Banerjee states that no answer is required as to paragraph 1 as it states facts, except to state that in addition to being hired as a Portfolio Manager of the Funds listed, Banerjee was also 50% managing member of the General Partner of the Funds.

2. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 2, except admits that Banerjee signed an Employment Agreement in May of 2006. This employment agreement contained a confidentiality and non-solicitation provisions, along with other standard clauses.

3. Banerjee states that there was a case that was filed in April of 2008 and it was subsequently settled when the parties executed the Settlement Agreement in November 2008.

4.  Banerjee states that there was a Mediation Hearing that took place on September 24, 2008, where by a framework for a settlement agreement was discussed with a Mediation Judge Magistrate Hillman in Worcester, Massachusetts. Further negotiations and discussions were required to adequately address all issues of the Parties, Tuckerbrook and Banerjee. A final Settlement Agreement (which contained Mediation Transcript, General Mutual Release with a non-disparagement clause; no other provisions were agreed upon) were executed by both parties on or about November 6, 2008.

5.  Denies knowledge or information sufficient to form belief as to the truth of the allegations set forth in paragraph 5.

## PARTIES

6.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6.

7.  Admits that Banerjee is an American citizen and an Overseas Citizen of India with respect to the allegations contained in paragraph 7, except denies that Banerjee resides in Weston, Connecticut. He resides in India and visits the US for personal and business reasons.

## JURISDICTION AND VENUE

8.  Banerjee states that no answer is required as to paragraph 8 as it calls for a legal conclusion.

9.  Banerjee states that no answer is required as to paragraph 9 as it calls for a legal conclusion.

10. Banerjee states that no answer is required as to paragraph 10 as it calls for a legal conclusion.

## STATEMENTS OF FACTS

11. Denies knowledge or information sufficient to form a belief as to the truth of the statements set forth in paragraph 11.

12. Denies knowledge or information sufficient to form a belief as to the truth of the statements set forth in paragraph 12.

13. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13.

14. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14.

15. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15. Further answering, prior to Banerjee joining Tuckerbrook, Tuckerbrook had only $25 million in assets under management; post Banerjee joining Banerjee was able to grow the assets under management to over $100 million. Nearly 85% of the growth in capital came from Banerjee's contacts with the foundation and endowment world from which he came from. Banerjee had managed over $3 billion in assets while at large investment organization with $30 billion in assets. Tuckerbrook was terminated as an Investment Manager and a General Partner to the Funds managed by Mr. Banerjee (Key Man) departure.

16. Banerjee states that in addition to being hired as a Portfolio Manager for the Funds, he also formed a 50-50 partnership with Tuckerbrook to manage the Funds in May 2006.

17. Denies the allegations contained in paragraph 17, except admits that Banerjee signed an employment agreement which speaks for itself.

18. Denies the allegations contained in paragraph 18. Further answering, Tuckerbrook and Banerjee were 50-50 partners and as such equally owned all the work product created by the General Partner to market the Funds. This fact was indeed corroborated by her Hon. Judge Patti Saris in a hearing held in June of 2008, where she expressly states that as 50-50 Managers, the books and records of the general partnership are to be shared equally and Banerjee will not be barred from access to any of the information. Hon. Judge Patti Saris states in her Memorandum and Order, "*In addition, Tuckerbrook shall provide Banerjee full access to all books and records of the general partnership.*" Please see Page 13 of **Exhibit 1**, Hon. Judge Patti Saris Memorandum and Order of June 8, 2008.

19. Denies the allegations contained in paragraph 19. Further answering, it was only Banerjee that had the expertise to create the work product used to market the Funds. In fact, Banerjee created the marketing materials used while he was at well-known investment management organization, where he worked prior to his association with Tuckerbrook. As a co-managing member of the general partner-all work product belonged to both Banerjee and Tuckerbrook. Please see **Exhibit 1**, Hon. Judge Patti Saris Memorandum and Order of June 8, 2008.

20. Admits the allegations contained in paragraph 20, except denies that Banerjee breached an agreement.

21. Admits the allegations contained in paragraph 21, as it is a statement of fact.

22. Admits the allegations contained in paragraph 22, except denies any implications that Banerjee breached an agreement.

23. Admits the allegations contained in paragraph 23 that on September 23, 2008, following a day of mediation with Magistrate Hillman in Worcester, Massachusetts, Tuckerbrook and Banerjee reached a settlement in theory, except denies that the parties entered into a settlement on the aforementioned date resolving Tuckerbrook v. Banerjee I. At the time of the Mediation Hearing, a transcript of the hearing was entered into memoriam whereby the salient points of the common points of agreement were noted and agreed upon. The actual Settlement Agreement included the transcript of the Hearing, the General Releases and the joint order to release the Management Fees held in escrow with the Court. These documents were executed and effective on November 7, 2008, according to Tuckerbook's Counsel. Please see **Exhibit 2.**

24. Denies the allegations contained in paragraph 24 inasmuch as: (a) a written settlement agreement was never entered into by Tuckerbrook and Banerjee, but rather the parties entered into a General Mutual Releases and Non-Disparagement Agreement which speaks for itself; and (b) the transcription in open court in the U.S. District Court for the District of Massachusetts did not detail the settlement that was reached during mediation, but rather it was a transcription of the settlement in principle between Tuckerbrook and Banerjee.

25. Admits the statements contained in paragraph 25.

26. Denies the allegations contained in paragraph 26 to the extent the term "Transcribed Settlement" implies that the court transcription was the operative final settlement between Tuckerbrook and Banerjee. Further answering, the court transcription speaks for itself.

27. Denies the allegations contained in paragraph 27 to the extent the term "Transcribed Settlement" implies that the court transcription was the operative final settlement between Tuckerbrook and Banerjee. Further answering, the court transcription speaks for itself. Additionally, Tuckerbrook, themselves released a statement on or about Sept 24, 2008, detailing all the terms of the Settlement Agreement without informing Banerjee.

28. Denies the allegations contained in paragraph 28 to the extent the term "Transcribed Settlement" implies that the court transcription was the operative final settlement between Tuckerbrook and Banerjee. Further answering, the court transcription speaks for itself.

29. Admits the allegations contained in paragraph 24 to the extent that Tuckerbrook released Banerjee pursuant to the terms set forth in a Release and Non-Disparagement Agreement which speaks for itself.

30. Admits the allegations contained in paragraph 25 to the extent that Banerjee released Tuckerbrook pursuant to the terms set forth in a Release and Non-Disparagement Agreement which speaks for itself.

31. Denies the allegations contained in paragraph 31 to the extent the term "Settlement Agreement" implies that Tuckerbrook and Banerjee entered into a written settlement agreement, except admits the allegations contained in paragraph 31 to the extent that Tuckerbrook and Banerjee entered a Release and Non-Disparagement Agreement which speaks for itself.

32. Denies the allegations contained in paragraph 32.

33. Denies the allegations contained in paragraph 33.

34. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34. Further answering, the cash payment that was given at the time the parties signed the Settlement Agreement (Nov 6, 2008) was a payment of the management fees owed to Banerjee. Hon. Judge Saris states, "Tuckerbrook shall pay forthwith Banerjee's share of the management fees through the date of his termination". Please see Hon Judge Saris's Memorandum and Order of June 4, 2008, page 13, **Exhibit 1.** These monies were not their property and had nothing happened between Banerjee and Tuckerbrook these management fees would have been paid to Banerjee in a timely manner, thus demonstrating that payment of these monies would not pose a financial hardship for Tuckerbrook.

35. Denies the allegations contained in paragraph 35 that Banerjee had any of the work product of the Funds. Further answering, the marketing materials of the Fund were the property of the general partner and as such owned equally by both. Additionally, the client database was in fact Banerjee's property not Tuckerbrook's property. The Funds were governed by a Limited Partnership agreement and the General Partner (where Banerjee was a Co-Managing Member and 50% owner) owned all the books and records and work products. Tuckerbrook's claim is baseless and meritless.

36. Denies knowledge or information sufficient to form a belief as to the truth of the allegations with regard to the Alkek Lawsuit.

37. Denies knowledge or information sufficient to form a belief as to the truth of the allegations with regard to the Alkek Lawsuit Discovery process.

38. Denies the allegations contained in paragraph 38 that Banerjee revealed confidential terms to the Director of the Plaintiff in the Alkek Lawsuit. Further answering, Banerjee denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38 concerning the Director's testimony in a deposition in the Alkek Lawsuit.

39. Denies the allegations contained in paragraph 39. Further answering, with reference to the business relations, Mr. Banerjee allegedly "assist[ed] and coordinat[ed] with Alkek in its lawsuit against Tuckerbrook." The elements of the tort include that the alleged loss of the relationship directly resulted from the conduct, *Comey v. Hill,* 387 Mass. 11. 19 (1982), and that the interference was for an improper purpose. *Buster v. George W. Moore, Inc.,* 438 Mass. 635, 652 (2003). But the Alkek lawsuit revolved around Alkek's (and other limited partners') exercise-*in May 2008*—of their contractual right to withdraw from the investment funds in the wake of Tuckerbrook's termination of Mr. Banerjee. Mr. Banerjee's alleged acts after September 23, 2008 came months after the relationship with Alkek had ended. Please see **Exhibit 3**, where the Limited Partners had terminated Tuckerbrook as the General Partner and Investment Manager prior to September 2008. Accordingly, Mr. Banerjee's alleged actions cannot possibly have interfered with Tuckerbrook's relationship.

Even if the Court were to accept the allegations of the Complaint as true (which is not the correct standard), it alleges that the motive for Banerjee's alleged "interference" was his supposed effort to compete (the settlement agreement of November 2008 allows Banerjee to compete with Tuckerbrook; Tuckerbrook and its Directors and Counsel seem to be delusional if they think otherwise). This is not sufficient under Massachusetts law. *See, e.g., Hunneman Rewal Estate Corp. v. The Norwood Realty, Inc.* 54 Mass. App. Ct. 416, 428-29 (2002) (no improper interference if conduct is directed even in part to advancing competitive interests). Moreover, the alleged interference must have directly caused "actual" and "non-speculative" damages. *See, e.g., Baxter, Inc. v. Landry,* 2007 WL 3015098, *4 (Mass. Super. 2007). As the relationship with Alkek had ended months before the settlement, Banerjee's alleged post-settlement actions could not possibly have directly caused any damages.

40. Denies the allegations contained in paragraph 40.

41. Denies the allegations contained in paragraph 41. Further answering, Banerjee created the work product and marketing materials that were used for the Funds.

42. Denies the allegations contained in paragraph 42.

43. Denies the allegations contained in paragraph 43.

## COUNT I

### (Breach of Contract)

44. Banerjee realleges and incorporates paragraphs 1 through 43 above as if set forth fully herein in their entirety.

45. Denies the allegations contained in paragraph 45. Further answering, the Settlement Agreement along with the Releases became a valid document once the parties (Banerjee and Tuckerbrook) executed the document in November 2008, and not when it was contemplated, in September of 2008.

46. Denies the allegations contained in paragraph 46.

47. Denies the allegations contained in paragraph 47. Further answering, as for the non-competition of Count I, Banerjee is alleged to have "competed with Tuckerbrook or made significant efforts to compete." In fact the Settlement Agreement and the accompanying Releases has no reference to any non-compete language. **The Transcribed Settlement Agreement did not prohibit Banerjee from competing directly or indirectly with Tuckerbrook.** The Transcribed Settlement Agreement did have a non-solicitation clause which stated

> "directly or indirectly as a consultant, employee of a third party, or in any other capacity or fashion work for and/or receive payment, compensation, or any other consideration from any current or former limited partner of GDF or GSS and will not directly or indirectly as a consultant, employee of a third party, or in any other capacity or fashion work for and/or receive payment, compensation, or any other consideration from or advise in any way the GDF or GSS partnerships, their general partner or affiliates as defined in the respective limited partnership agreements or GDF, GSS. Further, Mr. Banerjee will not interfere with any relations Tuckerbrook has or will have with the limited partners to GDF or GSS or the third-party vendors or other affiliates of GDF or GSS."

48. Denies the allegations contained in paragraph 48. Further answering, Banerjee notes that the Complaint is highly non-specific as to the alleged conduct, substantially hindering his ability to show that he has meritorious defenses. With respect to disparagement, "derogatory and disparaging" are not defined in the settlement and Tuckerbrook's extreme hostility toward Banerjee, it is fair to assume that it is taking an extremely broad view of them. However, it is Tuckerbrook's burden to prove the content of the statements and that they fell within the scope of those terms as the parties understood them. Tuckerbrook also must

prove that it suffered non-speculative damages from the alleged statements. Tuckerbrook will not be able to satisfy either burden. Also, Tuckerbrook would need to prove that those statements, if any, are not governed by the Releases of the Settlement.

## COUNT II
(Tortious Interference with Contract and/or Advantageous Business Relations)

49. Banerjee realleges and incorporates paragraphs 1 through 48 above as if set forth fully herein in their entirety.

50. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 50. Further answering, the Limited Partners of the Funds terminated Tuckerbrook as the General Partner and purported Investment Manager of the Funds in a letter dated August 2008.

51. Denies the allegations contained in paragraph 51. Further answering, as to the allegations of interference with business relations, Banerjee allegedly "assist[ed] and coordinat[ed] with Alkek in its lawsuit against Tuckerbrook." The elements of the tort include that the alleged loss of the relationship directly resulted from the conduct, *Comey v. Hill,* 387 Mass. 11, 19 (1982), and that the interference was for an improper purpose. *Buster v. George W. Moore, Inc.,* 438 Mass 635, 652 (2003). But the Alkek lawsuit revolved around Alkek's (and other limited partners') exercise-*in May 2008*—of their contractual right to withdraw from the investment funds in the wake of Tuckerbrook's termination of Banerjee.[1] Banerjee's alleged acts after September 23, 2008, came months after the relationship with Alkek had ended. Accordingly, Banerjee's alleged actions cannot possibly have interfered with Tuckerbrook's relationship.

Even if the Court were to accept the allegations of the Complaint as true (which is not the correct standard), it alleges that the motive for Banerjee's alleged "interference" was his supposed effort to compete. This is not sufficient under Massachusetts law. *See, e.g., Hunneman Real Estate Corp. v. The Norwood Realty, Inc.* 54 Mass. App. Ct. 416, 428-29 (2002) (no improper interference if conduct is directed even in part to advancing competitive interests). Moreover, the alleged interference must have directly caused "actual" and "non-speculative" damages. *See, e.g., Baxter, Inc. v. Landry,* 2007 WL 3015098, *4 (Mass. Super. 2007). As the relationship with Alkek had ended months before the settlement, Banerjee's alleged post-settlement actions could not possibly have directly caused any damages.

---

[1] A copy of the complaint in the Alkek litigation is attached as **Exhibit 4**; the Court may take judicial notice of it. *See E.I. Du Pont de Nemours & Co. v. Cullen,* 791 F.2d 5, 7 (1st Cir. 1986)

52. Denies the allegations contained in paragraph 52

53. Denies the allegations contained in paragraph 53.

## COUNT III
### (Misappropriation of Trade Secrets)

54. Banerjee realleges and incorporates paragraphs 1 through 53 above as if set forth fully herein in their entirety.

55. Denies the allegations contained in paragraph 55.

56. Denies the allegations contained in paragraph 56.

57. Denies the allegations contained in paragraph 57.

58. Denies the allegations contained in paragraph 58.

59. Denies the allegations contained in paragraph 59.

60. Denies the allegations contained in paragraph 60. Further answering, Banerjee denies that he appropriated any Tuckerbrook trade secrets. Indeed, Tuckerbrook had no prior experience in distressed investments before forming a partnership with Banerjee. All of the investment strategy, portfolio construction methods, etc., were the fruit of Banerjee's own long career managing distressed investment funds. To the extent that he brought that expertise to the relationship with Tuckerbrook, he was fully entitled to continue using it after his relationship with Tuckerbrook ended. The Hon. Judge Saris states in her Memorandum and Order dated June 4, 2008.

> "...Banerjee and Tuckerbrook are each 50% members and managing members of the general partner. Thus, neither owns more than 50% and cannot be considered "controlling"[.] ...Tuckerbrook shall provide Banerjee full access to all books and records of the general partnership."

As such all work product will be owned by both General Partners, equally.

61. Denies the allegations contained in paragraph 61.

62. Denies the allegations contained in paragraph 62. Further answering, Tuckerbrook fails to prove that Banerjee has committed any theft of any work product and in fact it would be nearly impossible for Tuckerbrook to prove when Banerjee can show that all the marketing materials of the Funds was created to prior the inception of the Banerjee and Tuckerbrook relationship.

## COUNT IV
### (Violation of MGL Ch. 93A.)

63. Banerjee realleges and incorporates paragraphs 1 through 62 above as if set forth fully herein in their entirety.

64. Denies the allegations contained in paragraph 64. Further answering, as stated previously, the Complaint is highly non-specific as to the alleged conduct, substantially hindering his ability to show that he has meritorious defenses. This allegations of MGL 93A, is also non-specific. It rather seems like the Plaintiff is grasping at straws rather than having concrete allegations.

## COUNT IV
### (Breach of 2011 Settlement Agreement)

65. Banerjee realleges and incorporates paragraphs 1 through 64 above as if set forth fully herein in their entirety.

66. Admits the allegations contained in paragraph 66.

67. Admits the allegations contained in paragraph 67

68. Admits the allegations contained in paragraph 68 except that Banerjee denies that he did not testify truthfully during the deposition. Further answering, Banerjee has gone out of his way as his investors will corroborate to tell the truth and is considered by the industry as an upstanding and honest money manager. Whereas, Tuckerbrook and John J Hassett have been sued by investors time and time again for theft of funds, misrepresentations, misleading statements, incorrect accounting, fraudulent business practices and the like. In fact the current Litigation between Tuckerbrook and Alkek, Alkek claims that Tuckerbrook has stolen millions.

69. Admits the allegations contained in paragraph 69.

70. Denies the allegations contained in paragraph 70. Further answering, the first element of the Settlement Agreement requires actual documentary proof that contradicts Mr. Banerjee's testimony. Tuckerbrook's hopes, suspicions and beliefs are not sufficient. Neither are the strained inferences Tuckerbrook seeks to draw from the documents that were submitted as part of the deposition. Nor are Tuckerbrook's efforts to include extraneous material in an attempt to disparage Mr. Banerjee and his character through allegations unrelated to the testimony at issue here. No documentary evidence submitted by Tuckerbrook contradicted Mr. Banerjee's testimony.

Because Mr. Banerjee provided truthful testimony, Tuckerbrook cannot meet the second element of its burden either, the burden of establishing that Mr. Banerjee's testimony was untruthful. Establishing

that the testimony was untruthful requires more than merely asserting that Tuckerbrook does not believe the testimony, that the testimony was inaccurate or that Mr. Banerjee was mistaken. Instead, to meet its burden, Tuckerbrook must establish that Mr. Banerjee intentionally lied in the deposition. Arbitrator Hinkle could not declare the testimony untruthful using perjury standards and so she created her own standard to find the part dealing with the Settlement date "untruthful" in 6 hour deposition. So Tuckerbrook enjoys the benefit of the deposition in their litigation against Alkek.

"The crime of perjury in a judicial proceeding occurs whenever one 'willfully swears or affirms falsely in a matter material to the issue or point in question.'" *Commonwealth v. Geromini*, 357 Mass. 61, 63 (1970) (quoting G. L. c. 268, § 1.)[2] While in this context, proof beyond a reasonable doubt may not be required, Tuckerbrook bears the burden of proving that: "(1) the defendant 'made a statement under oath in a judicial proceeding;' (2) 'the statement was false;' (3) the defendant 'knew the statement was false at the time [it was] made,' and the defendant 'made the statement willfully;' and (4) 'the statement was material to the issue or point in question.'" *Commonwealth v. White*, 70 Mass. App. Ct. 71, 76 872 N.E.2d 833 (App. Ct. 2007) (quoting Massachusetts Superior Court Criminal Practice Jury Instructions § 2.48 (Mass. Continuing Legal Educ. 1999 & Supp. 2003).

Here, Tuckerbrook or Arbitrator Hinkle has not satisfied either the documentary standard, the perjury standard or the materiality standard. *See, e.g., Giuliano v. Vacca*, 2004 Mass. App. Div. 154, 161 (App. Div. 2004) (reversing a finding of perjury where, faced with competing affidavits, "one could have assigned more weight to" one view of the ownership at issue over another, "[b]ut to transform the disputed factual underpinning of the ownership dispute into a finding of 'guilt' of 'perjury . . . seems unjustifiably harsh, and is unwarranted").

71. Denies the allegations contained in paragraph 71.

72. Banerjee denies the allegation that he breached the Settlement Agreement of 2011. Further answering, Banerjee states that if in fact the Settlement Agreement of 2011 is considered null and void, then the

---

[2] *By its terms, the Settlement Agreement "shall in all respects be interpreted, enforced and governed by the laws of the Commonwealth of Massachusetts, irrespective of choice of law provisions." Also, the deposition at issue occurred in Massachusetts. Thus, Massachusetts law applies to the current dispute.*

$12,500 should be returned immediately to Banerjee. This consideration was paid because the Settlement Agreement of 2011 was considered valid and in force.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Tuckerbrook fails to state a claim against Banerjee upon which relief can be granted.

### Second Affirmative Defense

Tuckerbrook is not entitled to the relief requested as to Tuckerbrook's claims inasmuch as Tuckerbrook has failed to sufficiently plead all necessary elements to such claims.

### Third Affirmative Defense

Tuckerbrook's claims are barred by lack of subject matter jurisdiction.

### Fourth Affirmative Defense

Tuckerbrook's claims are barred by its own unclean hands.

### Fifth Affirmative Defense

Tuckerbrook is estopped by its own actions and conduct from bringing its claims.

### Sixth Affirmative Defense

Tuckerbrook's claims are barred by the doctrine of waiver.

### Seventh Affirmative Defense

Tuckerbrook's claims are barred by the doctrine of laches.

### Eight Affirmative Defense

Any injury or loss alleged by Tuckerbrook was the result of superseding or intervening causes beyond the control of Banerjee.

### Ninth Affirmative Defense

If Tuckerbrook has suffered damages as alleged, which Banerjee denies, such damages were not factually or proximately caused by Banerjee.

### Tenth Affirmative Defense

If Tuckerbrook has suffered damages as alleged, which Banerjee denies, such loss was not the foreseeable consequence of any legal duties or obligations owed by Banerjee, nor did the loss occur as a proximate result of any breach of any such legal duty or obligation.

<u>Eleventh Affirmative Defense</u>

Tuckerbrook is not entitled to the damages that it seeks inasmuch as even if liability were to be established (which is disputed), the damages are too remote and not reasonably foreseeable.

<u>Twelfth Affirmative Defense</u>

Banerjee hereby gives notice that he intends to rely upon such other and further defenses as may become available or apparent during pretrial proceedings in this action and hereby reserves all rights to amend his Answer and Counterclaim to the Verified Complaint and all such defenses.

## COUNTERCLAIMS

## BACKGROUND

1. In late 2005, Banerjee, who has over 15 years of experience at leading investment banking and investment management organizations, left a large CT-based investment manager, where he had been serving as managing director and portfolio manager for two distressed private equity funds, in order to start his own funds.

2. To start his own fund, Banerjee needed a partner to shoulder start-up costs and provide office space and back office services. He was introduced to Jay Yoder at Tuckerbrook, which at the time was a relatively tiny player in the industry, with only $25 million under management. In May 2006, after months of negotiations, Banerjee and Tuckerbrook entered into an agreement to open a series of distressed funds.

3. Tuckerbrook and Banerjee created three funds, each in the form of Delaware limited partnerships: (1) Tuckerbrook | SB Global Special Situations Fund, L.P. ("GSS"); (2) Tuckerbrook | SB Global Special Situations Fund, L.P. ("GDF"); and (3) TAI-SB Sun Capital Side Fund, L.P. ("Side Fund") (collectively the "Funds"). Banerjee's initials "SB" were included in the names of each fund to designate 50-50 nature of the ownership.

4. Banerjee and Tuckerbrook recognized that Tuckerbrook had no experience in distressed investing, so the GDF LPA specifically named Banerjee as "Portfolio Manager". Also, Banerjee executed an employment agreement with Tuckerbrook which entitled him to 50% of the management fees of the funds he created. Mr. Banerjee did that since Tuckerbrook did not have much AUM (only $25mm) and very few prospects in Mr. Banerjee's view and thereby small equity value of Tuckerbrook Alternative Investments. Accordingly,

Banerjee wore this second hat, aside from the one that he wore as the 50% managing member of the GP Entities. The GP entities were the owners of the Funds.

5.  Shortly after Banerjee joined and created the GP entities, Tuckerbrook|SB GP, he was told that Jay Yoder was no longer going to be the CIO nor was he to be in the management structure, i.e. Board of Directors or Executive Committee and that John J Hassett was assuming the CIO role. Further, Jay Yoder was going to be only the portfolio manager of the real assets fund and a member of the GP of that real assets fund. Banerjee had focused his due diligence of Tuckerbrook, based on Jay Yoder's involvement, i.e. decided to take on Tuckerbrook as a partner based on Jay Yoder's senior involvement. John J. Hassett was in charge of another entity Radius Capital LLC and had been previously only peripherally associated with Tuckerbook (as Mr. Banerjee understood it), and as of June 2006, was now becoming a managing member of Tuckerbrook. At that time, June 2006, **none** of John Hassett's previous litigation proceedings **were never disclosed to Banerjee or to the investors** as is required in the Due Diligence Questionaire[3]. During this case's discovery phase, several background items from John Hassett's past came to light specifically, litigations such as Lind-Waldock, AT/Com, and investor lawsuits like Paarlberg. None of these previous litigations were ever disclosed in formal questionnaires like the DDQ which amounts to misleading investors. This was a blatant violation of the Investment Advisers Act of 1940. In addition, Mr. Hassett has also sued his Counsel, Bingham, McCutchen.

6.  Banerjee was a Co-Managing Member of the General Partner of the Funds he managed.

7.  Tuckerbrook, on the other hand, at all relevant times was, limited to merely providing back office functions including client service and accounting and other support functions for Mr. Banerjee. This function of Tuckerbrook was memorialized as well.

8.  The LPs expected (and indeed insisted) that Banerjee (who had a verifiable track record in investments) and no one else should be Portfolio Manager, so they demanded on the insertion of a "Key Man" provision that would allow them an escape hatch if Banerjee ceased to be the Portfolio Manager. Please see below an excerpt of a letter from Brandon Evans, of NCR Corporation (in May 2008) which states that

    *"The Limited Partners invested in these funds with the expectation that they would be managed by Sumanta, and it is our clear preference that Sumanta [Banerjee] function as the Portfolio*

---

[3] A due diligence questionnaire is an important document for an investor to understand the background of the management and employees as well as understanding the details of the fund. Misrepresentation in the DDQ is a violation of the Investment Advisors Act of 1940.

*Manager of all the funds. If a settlement can be reached under which Sumanta [Banerjee] is reinstated as Portfolio Manager of the funds, the Steering Committee will not seek the fee adjustments outlined in paragraph 4. If Sumanta [Banerjee] is not reinstalled as Portfolio Manager, then the Steering Committee will request the changes outlined in paragraph 4."*

This goes to show that Banerjee was the key to the performance and structure of the funds he created. **The intellectual property and trade secret was not Tuckerbrook's property but belonged to the General Partner – in which both Banerjee and Tuckerbrook were Managing Members.**

9. Banerjee's involvement with the Funds grew the fund from $0 to $125 million, from May 2006 to March 2008.

10. Banerjee was a portfolio manager with the Investment Manager which was Tuckerbrook Alternative Investments, however, the GP which Banerjee was a 50% member of, never hired Tuckerbrook as an Investment Manager by executing the Investment Management Agreement (IMA) with Tuckerbrook. **Tuckerbrook tried to steal the Funds from Mr. Banerjee by unilaterally executing the IMA,** which Judge Saris found was not valid, as did the LPs. **Litigation between Banerjee and Tuckerbrook ensued over control of the Funds in April 2008.** In August 2008, the LPs with an 80% vote eventually wrested control from Tuckerbrook and fired Tuckerbrook from their role as the purported Investment Manager. The LPs also removed the GP entity of GDF and assumed control. The LPs wrote to Tuckerbrook and notified them in a letter from Steve Klugman, of Debevoise and Plimpton. Please see **Exhibit 3**.

11. Tuckerbrook, as the purported Investment Manager of the Funds, was responsible for the back office responsibilities, including collecting the Management Fees for the GPs of the Funds. Tuckerbrook had neglected, failed and refused to pay Banerjee any of his quarterly Management Fees for the second and third quarters of 2008. The Hon. Judge Saris had ordered Tuckerbrook to have all outstanding Management fees paid to Banerjee, during one of the many appearances in Court. However since litigation was continuing, the parties agreed to keep the Banerjee's share of the management fees in escrow with the Court. Banerjee entered into the Final Settlement Agreement in consideration for the release of the escrowed management fees.

12. Banerjee's contacts—which pre-existed his relationship with Tuckerbrook—accounted for over 85% of the capital invested in the Funds. Banerjee built the Funds, being responsible for over 85% of the capital committed. Tuckerbrook had almost no contacts of its own until Banerjee provided his own list of nearly

5,000 contacts. This list is the one that the Plaintiff has repeatedly but falsely made claim to. Additionally, after the LP's took control of the GP and removed Tuckerbrook from that role, the LP wrote a letter ordering Tuckerbrook to cease and desist from all Management activities as it related to the Funds. **Thus the investors were no longer clients of Tuckerbrook when Banerjee entered into the Settlement in 2008.**

13. Towards the end of the relationship with Tuckerbrook and during the litigation with Tuckerbrook, Banerjee became aware of *several violations of the 40's Act of the Investment Advisors Act by Tuckerbrook*. These violations included omissions of previous litigations in Fund offering documents, financial transfers in violation of Fund documents and misrepresentation of AUM in SEC filings of HT Capital (in conjunction with the Hardt Group). In fact, Banerjee had countersued Tuckerbrook for Violations of the 40's Act of the Investment Advisors Act along with various breaches of contract, etc. The previous litigation of John Hassett and Paarlberg (an investor) which was not mentioned in the DDQ, in an effort to mislead Banerjee and the Investors.

14. Tuckerbrook cannot lay claim to any of the material that was used in marketing because the materials were marketing materials, which Banerjee created, and which relate to his underlying managers. In addition, all the marketing materials and other related files that were created with regard to the Funds were the property of the GP, which was jointly owned by Tuckerbrook and Banerjee. Also, the Honorable Judge Patti Saris had ruled, that all the work products belonged to the General Partner of the Funds and had ordered Tuckerbrook to release all information to Banerjee, based on his status as a Managing Member of the Funds. Besides, Counsel Carnathan has neglected to inform this Honorable Court that there are mutual releases in place which prevent either party, Banerjee or Tuckerbrook, to file lawsuits against each other for actions that took place prior to Settlement.

15. Banerjee and Tuckerbrook continued to litigate until September of 2008.

16. Finally, the parties agreed to a court-led mediation which was conducted on September 23, 2008. During that mediation, the Judge required the parties to go on record and delineate terms of a settlement that was to be finalized with additional negotiations, agreements and releases. At the conclusion of the Mediation, although the Parties had agreed on certain terms, it was unclear whether the final settlement had occurred, in light of prior history. There were several draft settlement agreements, confidentiality agreements,

releases and mutual non-disparagement clauses exchanged and Mr. Banejee's co-counsels – Thomas Gallitano (Conn, Kavanaugh) and Douglas Hirsh (Sadis and Goldberg) fought bitterly with Messrs Carnathan and O'Connor over the Settlement Documents. As Parties could not agree, the two sides decided to go with the settlement transcript on record which then became the Final settlement Agreement on a "de facto" basis. In November 2008, Counsels for both parties threatened each other that "settlement had not occurred." **The Settlement Agreement was signed and became Effective (as per O'Connor who was Tuckerbrooks counsel in emails to Banerjee's counsel)** and_Joint Motion to release escrowed management fees to Banerjee was done on November 7, 2008, and the money was released on Nov 21, 2008. **Thus, the Settlement became effective in November 2008 and not September as asserted by Tuckerbrook Counsel.** Mr. Banerjee has not disclosed the terms of the Settlement but Mr. Hassett disclosed its contents in May 2009 and Mr. Carnathan has provided it to Alkek Foundation in July 2009 and then claimed damages. Carnathan had requested permission from Banerjee through Banerjee's counsel to be able to release the Settlement Agreement and all accompanying documents to the Alkek Group as a disclosure document of Alkek's litigation against Tuckerbrook, C.A. no 4:08-cv-3501.

17. The Final Agreement, was the Court Transcript, on a de facto basis which also became the Settlement date on a de facto basis, occurring on November 7, 2008, when it was actually signed. There were also standard releases, disparagement and defamation clauses that were included as part of the Settlement Agreement in addition to the Agreement that was memorialized in the Court. This final Agreement was NOT SIGNED until November 7, 2008.

18. On or about November 26, 2008, Alkek brought a suit against Tuckerbrook and related entities in the United States District Court, Southern District of Texas captioned Alkek & Williams LTD et al. v. Tuckerbrook Alternative Investments, LP. No. 4:08-cv-3501 (the "Alkek Litigation"). In this matter, Alkek claimed that Tuckerbrook did not abide by the terms of the Limited Partner Agreement and did not redeem Alkek's investment. There is a current case in the Superior State Court of CT with the two parties yet again, notated as FST:cv-11-6010952-S.

19. In the Alkek Litigation, Alkek asserted claims for (1) the breach of the Limited Partnership Agreement of the Fund, (2) a declaration that Alkek had withdrawn from the fund as of May 31, 2008 and (3) sought an accounting of the Alkek capital accounts (4) failure of Tuckerbrook to redeem the funds from the

investment program to which they had invested (5) in a follow-on appeal, there was evidence showing that instead of returning Alkek's capital in accordance with the Limited Partnership agreement, Tuckerbrook had actually withdrawn millions of dollars.

20. During discovery phase of the Alkek Litigation, Banerjee was deposed but due to illness and the fact that Banerjee had moved his place of residence to Kolkata, India, he was not able to physically appear for the deposition.

21. When Tuckerbrook was unable to obtain Banerjee's deposition for its defense against Alkek, Tuckerbrook resorted to filing a case against Banerjee, captioned Tuckerbrook Alternative Investments, LP v. Sumanta Banerjee, no. 1:09-cv-11672-WGY ("SB Litigation").[4] This case was the predecessor to the current case. The current case is virtually identical to the predecessor case.

22. Due to Mr. Banerjee residing in India, in order for him to be served correctly, as India is a member of the Hague Convention, Tuckerbrook was required to follow a strict procedural format. Tuckerbrook admits that it did not comply with the Hague Convention, but explains that that proper service would take time—which is no justification at all. *See Furukawa Elec. Co. v. Yangtze Optical Fibre & Cable Co.,* 2005 WL 3071244 (D. Mass. 2005) (that Hague Convention service may be "burdensome and expensive" does not excuse compliance). Even in this case, Tuckerbrook has refused to comply with the Hague service process.

23. The Plaintiffs, Tuckerbrook, have been on a path of harassment and coercion of Banerjee since this case was started in October of 2009. This Abuse of Process has been demonstrated repeatedly over the years through the various activities of Tuckerbrook, Hassett and his counsel. In order for the Court to understand the pattern that Tuckerbrook has been following for the past nearly four years, it is important to document the repeated actions of the Plaintiff.

24. The pattern of harassment, associated with the abuse of process and malicious use of prosecution began in November 2009, shortly after Tuckerbrook filed the SB Litigation. In order to coerce Banerjee to appear for the deposition, Tuckerbrook hired agents (Always) in India to follow and intimidate Banerjee and his

---

[4] It is worth noting that when it filed its Complaint, Tuckerbrook was urgently seeking to force Mr. Banerjee to return to the U.S. to be deposed in Tuckerbrook's litigation with the Alkek Foundation, a limited partner in the investment funds, in which fact discovery was nearing an end. Mr. Banerjee's documented health problems prevented that, but he repeatedly offered to testify by telephone or videoconference. Tuckerbrook refused and filed this lawsuit instead.

family. In a rare show of bravado, the agents actually barged into Banerjee's house and harassed his house workers.

25. In January and February 2010, the agents of Tuckerbrook even went so far as to follow Banerjee and his family around town. This type of harassment is not tolerated in India and is illegal. As a result Banerjee filed charges against the agents (Always Investigations) and Tuckerbrook in India, in order to cease the harassment. Please see attached **Exhibit 5**, a FIR (formal investigative report) that was filed in Kolkata, India. Tuckerbrook then resorted to alternate tactics.

26. On or about August 6, 2010, TB's Hassett sent via email a settlement offer and attached an affidavit as well (for Banerjee to sign). Hassett also sent over, to Banerjee's counsel at that time, an affidavit with the items that were most important to him. The entire affidavit was filled with outright lies and misrepresentations. It addressed none of the claims made in the civil case of the SB Litigation.

27. Indeed, the settlement conversations continued from August 2010 until a settlement was signed in June of 2011. As a condition of this settlement, Banerjee was to appear for a deposition in July 2011. Additionally, Banerjee was to pay Tuckerbrook a sum of $12,500. This was a far cry from the over $250,000 that was demanded as a relief of the SB Litigation.

28. The deposition of Banerjee, was conducted on or about July 21, 2011. During the six hour deposition, there were only two questions that pertained to the claims of the SB Litigation. All of the other questions centered on Banerjee's relationship with the investors of the Fund, of which Tuckerbrook and Banerjee had been equal General Partners. These two questions were (1) whether Banerjee had revealed the terms of the Mediation Hearing (which ultimately formed the basis of the 2008 Litigation Settlement Agreement) to one of the Limited Partners of the Fund; (2) had Banerjee disparaged Tuckerbrook and Hassett in an email (dated July 2008). This email was governed under the release of the 2008 Settlement in either September or November 2008.

29. By definition, a deposition is to be truthful, under punishment of perjury for false statements. This deposition that was taken in 2011 was a blatant attempt to obtain further information for Tuckerbrook to use in its case against Alkek, in the CT Superior Court.

30. Tuckerbrook was not satisfied with the information that Banerjee provided during the deposition as they were not able to use any of the truthful statements made by Banerjee to forward their own agenda against Alkek.

31. The terms of the Settlement of June 2011 allowed for arbitration in the event that the Settlement was not consummated, again allowing for Tuckerbrook to extract an affidavit and documents that Tuckerbrook either did not have or obtain in the previous litigations with Alkek and Banerjee. The Supplemental Settlement Agreement is quoted below:

> *Banerjee shall produce to Tuckerbrook in native format all emails and attached documents (50+) in his possession, custody or control concerning or relating to Alkek, Tuckerbrook, the Tuckerbrook-SB Global Special Situations Fund, the Tuckerbrook-SB Global Distressed Fund....Banerjee will answer Tuckerbrook's questions with respect to the documents he delivered pursuant to paragraph 1 above and follow up questions to his deposition testimony fully, truthfully and candidly in an interview setting... If requested, Banerjee shall provide an affidavit recounting such truthful and accurate information as Tuckerbrook may request.*

Again another blatant attempt at obtaining new documents and a follow-on affidavit, demonstrating the continuing pattern of abuse of process. **The legal process itself, in this matter, is misused and used for illegal and malicious purposes.** All this had nothing to do with the filed complaint. It was a fishing expedition to extract information from Banerjee that Tuckerbrook could use in their litigation against Alkek.

32. Again Tuckerbrook's actions were foiled again because, Banerjee refused to fabricate lies and perjure himself. When the latest settlement (July 13, 2012) in the SB Litigation was not consummated, yet another attempt was made on July 21, 2012. Below is a portion of the new Settlement of July 21, 2012.

> *"Upon production of the Declaration and Documents described above, Tuckerbrook shall have two (2) days in which to state whether it may use the Declaration or any of the Documents in the **pending litigation with Alkek**. If the Declaration or any of the Documents constitute evidence that Tuckerbrook may offer or otherwise use in the Alkek litigation, and Tuckerbrook states that it accepts its rights to use the Declaration or any of the Documents by signing the "Accepted" line below, then the draft declaration shall be made into a sworn affidavit ("Affidavit"), ... [emphasis added].*

Hassett sent via email a list of questions to be answered Banerjee in a Declaration/Affidavit so that it might use any information gathered against Alkek. The questions posed by Hassett had nothing to do with the SB Litigation but the Alkek litigation, again demonstrating the Plaintiff's abuse of process.

33. In Tuckerbrook's latest attempt (in January 2013, in this current case) demonstrating an abuse of process is so unusual that its rarely seen. In fact it amounts to extortion. In latest "Supplemental Settlement Agreement", (sent in January 2013), Tuckerbrook demands that Banerjee forever give up his attorney-client privileges:

> Banerjee, ...does irrevocably waive his right to asset the attorney-client privilege regarding his communications with his attorneys.... and further waives any right to assert any joint defense or common interest privilege or any other privilege whatsoever with regard to communications with attorneys acting for any of the Alkek parties, the so-called "Steering Committee" .....Banerjee shall provide such other correspondence or written confirmation of his waiver of attorney-client privilege as required by such attorneys to testify in the litigation.

34. Although Mr. Banerjee maintains that he has not been served with the complaint in this case, he has obtained a copy of the Complaint so as to defend himself against Tuckerbrook's claims. As of the writing of this reply dated August 14, 2013, Mr. Banerjee has not been served with the Complaint through the proper Hague Convention channels or by any other means including local Rule 4 (even though they do not apply here due to his status as a foreign resident of India). The complaints in the two cases, 11672 and the current 11643 are nearly identical.

35. This entire case (2009-2013) has been an exercise in trying to harass and coerce a testimony and evidence out of Mr Banerjee to be used by Tuckerbrook in the lawsuit filed against Alkek Foundation (lead investor in the Funds managed by Banerjee and Tuckerbrook). As your Honor can see very quickly that this was an abuse of process and malicious prosecution. This abuse of process is against the Rules of Federal Civil procedure, Rule 11(b)(1)(2)(3) and as the Honorable Judge Young acknowledged in the Status Hearing that was held on June 27th, 2012. Included as **Exhibit 6**, pg. 7, line 5-9.

> **Mr. Banerjee**: ...There's nothing in this. They just want information from me for another case.
> **The Court**: It sounds like, that sounds right to me....

36. As mentioned previously, Tuckerbrook's latest attempt at yet another Supplemental Settlement Agreement (January 2013) to settle the litigation which is without merit, goes far into the realm of desperation; demanding Banerjee give up his attorney-client privileges with any and all lawyers that he has spoken to since the 2008 lawsuit began. As a basic construction in the judicial system, the privilege is an ancient device. Banerjee has refused to give up this fundamental right. Tuckerbrook, has stated that, they would use the documents in their pending litigation and expects to somehow miraculously find out some

information that they have not yet found thru all their previous nefarious actions. Please see **Exhibit 7** where all Tuckerbrook is interested in accessing Banerjee's counsel to further their own lawsuit in this Settlement Agreement

## Counterclaim Count I: Breach of Contract

37. In the Settlement Agreement that was agreed into in June of 2011, Counterclaim Plaintiff Banerjee agreed to pay a sum of $12,500 (vastly different from the original claim of over $200,000) and give a deposition in order to settle all claims. As per the Settlement Agreement of 2011, which can be shown to the court under camera as it is a sealed document,

> *"[if] this settlement shall be null and void, the Payment [of $12,500] shall be returned to Banerjee and the litigation shall continue."*

Since that Settlement Agreement was rendered Null and Void, then the payment of $12,500 should be returned to Banerjee.

38. Additionally, Tuckerbrook, under the terms of the Settlement Agreement, if Tuckerbrook started another case, which is the current case, then the terms of the Settlement call for a full return of the monies paid. At the very least, Tuckerbrook contractually obligated to return the $12,500 paid by Banerjee, and is thereby in Breach of the Contract.

## Counterclaim Count II: ABUSE OF PROCESS

39. An abuse of process claim is established by showing that the defendant has: "(1) used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff by such misuse of process." *Verve, LLC v. Hypercom Corp.*, No. CV-05-0365-PHX-FJM, 2006 U.S. Dist. LEXIS 58398, at *15 (D. Ariz. Aug. 16, 2006); *Nienstedt v. Wetzel*, 133 Ariz. 348, 353, 651 P.2d 876, 881 (Ariz. Ct. App. 1982); *Clipper Affiliates v. Checovich*, 138 N.H. 271, 277, 638 A.2d 791, 795 (1994); *Blue Goose Growers, Inc. v. Yuma Groves, Inc.*, 641 F.2d 695 (9th Cir. 1981). Tuckerbrook sued Banerjee and held a club over Banerjee in order to extort "a favorable deposition" and information related to Alkek Lawsuit. They further tried to extort an "Affidavit" to further their chances against Alkek in the lawsuit. Banerjee has been harmed tremendously in his career, lost potential earnings, suffered health issues and mental anguish and the heavy financial burden caused by the legal fees as a result of Tuckerbrook and its Directors blatant

misue of process. An action for abuse of process requires a showing that the process has been used primarily to accomplish an ulterior purpose for which the process was not designed. "It is immaterial that the process may have been properly obtained or issued as a normal incident of the litigation involved. It is the subsequent misuse that constitutes the misconduct for which liability is imposed." *Nienstedt v. Wetzel*, 133 Ariz. 348, 353, 651 P.2d 876, 881 (Ariz. Ct. App. 1982). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Prosser and Keeton*, at 898. Abuse of process may be established where the ulterior or collateral purpose involved was to expose the injured party to excessive attorneys' fees and legal expenses. *Nienstedt v. Wetzel*, 133 Ariz. at 354. "There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." *Clipper Affiliates v. Checovich*, 138 N.H. 271, 276-77, 638 A.2d 791, 795 (1994). **Tuckerbrook has done all of the above.**

40. For the reasons stated above, Counterclaim Plaintiff alleges that Counterclaim Defendant Tuckerbrook's action constitute an abuse of process, by using this lawsuit and the previous case, x09:cv-11672-WGY as a club to extort and coerce Banerjee into providing untruthful testimony and Affidavits which would then be used against Alkek in another litigation in the CT Superior Court in Stamford where Tuckerbrook is facing theft charges of the millions of dollars. That case is noted as FST:cv-11-6010952-S.

41. Mr. Banerjee has suffered irreparable harm to his career, his health and his finances. He has has also suffered mental anguish as a result of this misuse of process.

## Counterclaim Count III: Defamation

42. Counterclaim Defendant Tuckerbrook and its Agent violated the "non-disparagement and derogatory clause" in the Settlement Agreement which states that the Parties include

> "Tuckerbrook and….its respective past and present officers, directors, partners, general partner, limited partners, shareholders, employees, servants, attorneys, insurers, **agents**, and other representatives, and the heirs, successors, executors, predecessors, affiliates, insurers, reinsurers,…" [collectively known as the Parties,]

> "…The Parties agree and warrant that they will refrain from making, disseminating, posting, publishing, placing on Web sites, or otherwise distributing any derogatory or

disparaging comments, whether orally, visually, or in writing, whether electronic or hard copy, to third parties regarding the other Party or its/his funds, partnerships, limited liability companies, business, products, services, or practices, or regarding its principals, employees, founders, customers, clients, or investors."

43. Counter Claim Plaintiff alleges that Tuckerbrook Counterclaim Defendant has repeatedly and continually caused harm through disparagement and harassment through its Agents (Always) and Counsel. Counterclaim Defendant, Tuckerbrook, has sent its agents all the way to India to the Plaintiff's place of residence to harass and disparage the Plaintiff to both authorities and Plaintiff's doctors. Defendant's Counsel, Carnathan repeatedly makes misstatements, outright lies, and purposely tries to confuse and obfuscate this Honorable Court. Please see the FIR, **Exhibit 5** filed at the Kolkata Police Station by Mr. Banerjee.

44. Counsel for Counterclaim Defendant has also made many disparaging remarks about Plaintiff as well as admitting that private investigators have been hired to harass and follow the Plaintiff.

45. Counterclaim Defendant has continually and repeatedly made misstatements, misrepresentations, and outright lies about the Counterclaim Plaintiff Banerjee.

46. Counterclaim Defendant has been directed by its Board of Directors to take the actions i.e., yet another frivolous lawsuit designed to waste the time of the Courts.

**47.** Counterclaim Plaintiff alleges that as a direct result of the frivolous lawsuit and the disparaging remarks of Tuckerbrook's agents (Always), Mr Banerjee has been adversely impacted.

48. Counterclaim Defendant Tuckerbrook did not suffer any harm as it relates to the Alkek case.

### Counterclaim IV: Violation of MGL Ch. 93A

49. Counterclaim defendant Tuckerbrook's conduct as described herein constitutes an unfair and deceptive trade practice within the meaning of M.G.L. ch. 93A, entitling Banerjee to an award of treble damages and attorney fees. In fact, the current Litigation in the Superior State Court of Stamford noted as FST:cv-11-6010952-S is entertaining a case whereby the Attorney General of CT has been notified of the conduct of Tuckerbrook and its directors.

### PRAYERS FOR RELIEF

WHEREFORE, Counterclaim Plaintiff Banerjee respectfully requests that this Court:

   a.  Grant Banerjee judgment on each of its claims;

   b.  Order Tuckerbrook to pay the $12,500 because the Settlement Agreement of 2011 was declared Null and Void.

c. Award Banerjee damages, including but not limited to direct, consequential, and incidental damages, in relation to each Counterclaim Count.

d. Preliminarily and permanently enjoin Tuckerbrook from further disparagement of Banerjee.

e. Award Banerjee punitive damages related to the mental anguish, lost earnings resulting from the specious litigation, extortion and coercion for the past 4 years of the abuse of process.

f. Order Tuckerbrook to cease and desist from again bringing frivolous lawsuits that unnecessarily tax the Courts time and purse.

g. Award Banerjee attorneys' fees and expenses due to the abuse of process that has been perpetrated by Tuckerbrook, its Counsels and its directors for the past years, in an amount no less than $100,000.

h. Award Banerjee an amount of not less than $2,000,000, the compensation he would have earned prior to the start of these series of frivolous lawsuits designed to threaten, harass, coerce and bully Mr. Banerjee into submission.

**COUNTERCLAIM PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

**Dated August 15, 2013**

**Respectfully submitted,**

**Sumanta Banerjee**
*Pro Se Litigant*
58/1 Ballygunje Circular Road
Kolkata 700019
India