EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TUCKERBROOK ALTERNATIVE INVESTMENTS, LP, <br> Plaintiff, <br><br> v. <br><br> SUMANTA BANERJEE and JOHN DOE, <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 08-10636-PBS <br> ) <br> ) <br> ) <br> ) |

### MEMORANDUM AND ORDER

June 4, 2008

Saris, U.S.D.J.

### INTRODUCTION

Plaintiff Tuckerbrook Alternative Investments, LP ("Tuckerbrook") has moved for a preliminary injunction ordering its former employee, defendant Sumanta Banerjee, not to compete against it in violation of the non-competition provision of his employment agreement. Banerjee, who has been fired by Tuckerbrook but retains a 50% interest in the general partners of three funds, has cross-moved for a preliminary injunction. Banerjee argues that he has not been terminated for cause, and that Tuckerbrook has engaged in self-dealing and breached a fiduciary duty by entering into an investment management agreement without authority.

The parties entered into a stand-still agreement pending a court order in this complicated, fractious dispute. Now Banerjee separately moves for dissolution of the stand-still agreement and an order requiring Tuckerbrook, among other things, to pay him his fair share of the management fees and provide him access to

the books and records of the partnership.

After a review of the submissions, the Court **ALLOWS-IN-PART** Tuckerbrook's motion for a preliminary injunction [Docket No. 7]; **DENIES** Banerjee's cross-motion for a preliminary injunction [Docket No. 13]; and **ALLOWS-IN-PART** Banerjee's motion for dissolution of the stand-still agreement and other relief [Docket No. 31].

### FACTUAL BACKGROUND

Based on a review of the preliminary injunction record, I find that the following facts are likely true.

1. Start-Up

Tuckerbrook is a registered investment advisor that manages hedge funds and private equity fund-of-funds. Its clients include university endowments, foundations, large and small wealth managers, private banks, fund-of-funds and other institutions. It has fourteen employees and a principal place of business in Marblehead, Massachusetts.

In May 2006, Tuckerbrook hired defendant Banerjee, who resides in Weston, Connecticut, to be Portfolio Manager for the Tuckerbrook/SB Global Distressed Fund I, LP ("Fund I"). "SB" are the defendant's initials. Ultimately Fund I had $104 million in assets under management. Over the course of the employment relationship the parties raised money for two additional funds: Tuckerbrook/SB Global Special Situations Fund, LP and TAI-SB Capital Side Fund, LP (together with Fund I, the "Funds"). As Director of Investments and Portfolio Manager, Mr. Banerjee was

2

to oversee the investment and allocation of the capital of the Funds. Banerjee also became a 50% managing member of three Delaware limited liability companies that serve as general partner entities to the three Funds.

Banerjee had worked the previous three years in a similar position at an entity named the Common Fund, and has extensive experience in the area of distressed investments. He was responsible for a large amount of the capital committed to the Funds. He claims he is responsible for 85% of the assets under management in the funds although Tuckerbrook hotly disputes the percentage.

2.  <u>The Three Agreements</u>

    a.  The Employment Agreement

On May 4, 2006, Banerjee executed an employment agreement (the "Employment Agreement") which had the following non-competition provision governing both the term of his employment and a "restricted period" lasting three months after termination. It provides:

> (a) Without the prior written consent of the Company, [Banerjee] agrees that during the Term [of his employment] and during the restricted Period (as defined below), if applicable, he shall not, directly or indirectly, other than on behalf of the Company, organize, establish, own, operate, manage, control, engage in, participate in, invest in, permit his name to be used by, act as a consultant or advisor to, render services for (alone or in association with any person, firm, corporation or business organization), or otherwise assist any person or entity that engages in or owns, invests in, operates, manages or controls any venture

3

>or enterprise which engages or proposes to
>engage in sponsoring or managing private
>equity fund or funds or hedge fund of funds
>making investments in distressed, mezzanine
>and/or credit focused private equity or hedge
>funds . . . . For purposes of this Agreement,
>"Restricted Period" shall mean (i) the three
>(3) month period following the termination of
>the Term and [Banerjee']s employment under
>this Agreement, if the Term and [Banerjee's]
>employment are terminated due to (A) Cause as
>defined herein ....

(Employment Agreement §12). "Cause" is defined to mean Banerjee's "material breach of any provision of this Agreement" or Banerjee's "willful failure to perform, or gross negligence in the performance of any duties and responsibilities under this Agreement, which willful failure or gross negligence remains uncured after 10 days notice from the company specifying in reasonable detail the nature of such failure or negligence." (Id. §8(a)(i)-(ii)). The parties agreed that Tuckerbrook could seek injunctive relief to enforce this non-compete provision. (Id. §13(b)).

In addition, Tuckerbrook and Banerjee agreed that each would own a 50% ownership interest in the general partners of the Funds. The general partner of Fund I was named Tuckerbrook/SB Global Distressed GP, LLC. In his capacity as "Director of Investments," and equity of owner of the general partner of each Fund, it was expected that Banerjee would "obtain access to the confidential information" of Tuckerbrook, and could affect its "good will" (See Employment Agreement, Preamble). Under the Employment Agreement, the Funds were to pay Tuckerbrook 100% of

4

the "regularly occurring investment management fees" and Banerjee was going to earn fifty percent of these fees. (Id. Preamble, §3(b)). In addition, the Funds would pay to the general partner of each fund incentive fees; Banerjee would get a fifty percent share. (Id. Preamble, §3(c)). The employment agreement incorporated by reference the other agreements of the parties. (Id. §19).

   b. The LLC Agreement

To create the general partner for Fund I, Banerjee and Tuckerbrook entered into a Limited Liability Company Agreement on July 1, 2006 (the "LLC Agreement") to form a limited liability company ("LLC"). (See LLC Agreement ¶2). Both became "managing members" of the LLC under the Delaware Limited Liability Company Act, 6 Del. C. §18-101 et seq.

The LLC Agreement provides: "There shall not be a 'manager' (within the meaning of the Delaware Act) of the Company. The Managing Members are, to the extent of their rights and powers set forth in this Agreement, agents of the Company for the purpose of the Company's business, and the actions of the Managing Members taken in accordance with such rights and powers shall bind the Company." (Id. ¶8).

   c. The Limited Partnership Agreement

The Third Amended and Restated Agreement of Limited Partnership for Fund I, dated October 23, 2007 (the "Limited Partnership Agreement"), provides that the general partner (of which Tuckerbrook and Banerjee are 50% managing partners) shall

5

have "full, exclusive and complete discretion to manage the Partnership." (Limited Partnership Agreement, art. 5.01). Of significance here, it then states:

> The General Partner will enter into a Management Agreement with Tuckerbrook whereby Tuckerbrook will assume responsibility with respect to certain management functions on behalf of the Partnership in return for the Management Fee.

(Id.). The General Partnership is authorized to enter into agreements "on behalf of the Partnership." (Id. art. 5.01(e)). The Agreement provides for removal of the General Partner upon a vote of limited partners holding 75% of the percentage interests "for any reason or no reason." (Id. art. 7.03).

3. Loggerheads

By December 2007, investments for Fund I were 75% allocated and Tuckerbrook and Banerjee began efforts to start a second fund. To that end, Tuckerbrook and Banerjee began to notify Fund I investors of plans for Fund II. Toward the end of 2007, the relationship between Tuckerbrook and Banerjee became rocky. In December 2007, Tuckerbrook asked Banerjee to provide his personal trading records in accordance with SEC requirements and the Code of Conduct. Banerjee refused to provide his personal trading records despite repeated requests. Banerjee claims that he refused because he believed (as it turns out, in error) that he only held interests in mutual funds, which he was not required to disclose. In fact, however, he had stock and was properly required to turn over his trading records. Banerjee, however,

6

never received a termination for cause notice within the prescribed cure period.

In late 2007, Banerjee and Tuckerbrook also had a disagreement over control of expenses to be charged to the Funds. There were other disagreements about the failure to distribute management fees to Banerjee.

In March 2008, as acrimony intensified, Tuckerbrook discovered, after reviewing Banerjee's work emails, that Mr. Banerjee had been trying to team up with Calder Capital Partners - one of Tuckerbrook's direct competitors - to displace Tuckerbrook as the investment manager for the Funds. Tuckerbrook terminated its employment relationship with Banerjee "for cause" effective March 25, 2008, and he ceased being portfolio manager of the three Funds. In Banerjee's view, the reasons were merely a pretext for Tuckerbrook's efforts to steal the Funds he developed. Tuckerbrook later learned that Banerjee had directly approached another competitor, New Market Capital, for the same reason. Banerjee does not deny that he participated in these meetings. Banerjee and Tuckerbrook were engaged in a "[b]ake off" for control of the Funds. (Hassett Aff. ¶55).

Without permission from Banerjee, Tuckerbrook simultaneously entered into Investment Management Agreements on March 25, 2008 for each of the Funds, under which Tuckerbrook makes "the day-to-day management decisions of each fund." (Banerjee Aff., Docket No. 15, Ex. I). Until that point, Tuckerbrook had never had written agreements with the General Partner to manage the Funds.

However, Tuckerbrook had been performing these duties. Tuckerbrook sought affirmance from the limited partners of the new written agreement, but they did not approve the Investment Management Agreements. Some limited partners apparently want Banerjee to continue to act as Portfolio Manager. However, the limited partners have not voted to terminate the General Partner or invalidate the Investment Management Agreements.

There is a fact dispute as to whether Banerjee has been trying to unfairly thwart the capital calls.

## DISCUSSION

The standard for preliminary relief is well known: "A party who seeks a preliminary injunction must show: (1) that she has a substantial likelihood of success on the merits; (2) that she faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e., that the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose on the movant); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest." See McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001).

Based on the review of the record the Court finds that Tuckerbrook has demonstrated a substantial likelihood of success on its claim that it terminated Banerjee for cause because he committed a material breach of the Employment Agreement by approaching at least one competitor to manage a distressed fund-

of-funds in competition with Tuckerbrook. (See Affidavit of Jay Yoder).[1] See Orkin Exterminating Co., Inc. v. Rathje, 72 F.3d 206, 207 (1st Cir. 1995) ("Under Massachusetts law, employees occupying positions of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer.") (citation omitted). Accordingly, Banerjee must comply with the non-competition clause, which is reasonably limited in duration and scope, until June 25, 2008. Tuckerbrook need not demonstrate irreparable harm as Banerjee acknowledged in the Employment Agreement that a remedy at law would be inadequate (Employment Agreement §13(b)).

The parties disagree over whether the non-competition clause precludes Banerjee's involvement with the management of the three Funds. This issue is very difficult because the three intertwined agreements leave Banerjee as a co-managing member of the General Partners even after he is terminated. Moreover, this is not the typical non-competition situation, where an employer seeks to prevent an employee from working for a competitor. Tuckerbrook argues that Banerjee cannot compete with Tuckerbrook to manage any distressed fund. Instead, Tuckerbrook reads the non-competition provision broadly to preclude Banerjee from "competing" to manage the Funds he had formerly managed because

---

[1] While Banerjee also improperly failed to provide his trading records as required by the Code of Conduct, I am not persuaded on this record that this failure was a "material breach," as opposed to a "willful" failure to perform. (See Hausler Aff., ¶6 & Ex. 1). As no "notice to cure" was provided, I do not find a likelihood of success on this claim.

9

they are distressed funds.

Banerjee disagrees, pointing out that both the LLC Agreement and the Limited Partnership Agreement provide that the general partner will manage the investments. Moreover, Banerjee points out that the LLC agreement requires that the "managing members" (he emphasizes the plurality of the term) must agree before the partnership may be bound to a contract. Thus, in his view, both managing members have to agree before the Limited Partnership can enter into an investment management agreement; and if there is no such agreement, they must jointly manage the funds. Because Banerjee, as a managing member, did not agree that the general partners should enter into an investment management agreement with Tuckerbrook -- indeed, the dispute over the terms of the agreement contributed to the toxic relationship between the parties -- he argues that these agreements are not enforceable.

The LLC Agreement provides that it shall be governed by the laws of Delaware (LLC Agreement ¶20). Section 18-402 of the Delaware LLC Act only allows management authority in a limited liability company to be vested in a single "manager" if the company's operating agreement specifies a single manager.[2] 6 Del. C. §18-402. If no single manager is specified in the LLC agreement, §18-402 vests management in members "in proportion to

---

[2] "[I]f a limited liability company agreement provides for the management, in whole or in part, of a limited liability company by a manager, the management of the limited liability company, to the extent so provided, shall be vested in the manager who shall be chosen in the manner provided in the limited liability company agreement." 6 Del.C. §18-402.

10

the then current percentage or other interest of members in the profits of the limited liability company owned by all of the members, the decision of members owning more than 50 percent of the said percentage or other interest in the profits controlling." The LLC Agreement specifically states that there is no "manager" within the meaning of the Delaware Act. (LLC Agreement ¶8). Instead, Banerjee and Tuckerbrook are each 50% members and managing members of the general partner. Thus, neither owns more than 50% and cannot be considered "controlling" under §18-402.

While Banerjee may well prevail on his legal argument that the investment management agreements are ultra vires, this is a pyrrhic victory. The Limited Partnership Agreement expressly contemplated hiring Tuckerbrook to manage the funds (Limited Partnership Agreement, art. 5.01), and even though no written agreement had ever been signed, Tuckerbrook had been performing those duties for Fund I since 2006. This course of performance supports the existence of an implied contract. See generally Restatement (Second) of Contracts, §4 cmt. a (1981).

Under Massachusetts law, all writings that are part of the same transaction should be interpreted together. See Chelsea Indus. v. Florence, 358 Mass. 50, 55 (1970). When the contracts are read as a whole, the better argument is that Tuckerbrook has shown a likelihood of success in its argument that the broadly worded employment agreement should be read to preclude Banerjee from managing any fund making distressed investments for three

11

months.  Accordingly, I order Banerjee not to interfere with the
ongoing management of the funds by Tuckerbrook during the
restricted period, including capital calls, and not to hold
himself out as the portfolio manager.

Banerjee protests that the Funds will suffer irreparable
harm because Tuckerbrook was supposed to provide only back-office
and marketing services and he is the expert in distressed
investments.  Banerjee views Tuckerbrook's decision as a raw
power grab which will hurt the limited partners and jeopardize
his relationship with them.  However, Banerjee[3] has not
demonstrated any irreparable harm from enforcing the agreement
for such a short period of time.  While at least three limited
partners apparently view him as an essential player, the Limited
Partnership agreement expressly contemplated that Tuckerbrook
would manage the funds and that Banerjee might leave or be
terminated.  Moreover, no one is muzzling Banerjee, who will have
access to Tuckerbrook's books and records and be able to express
his views on the desirability of distressed investments.  In
balancing the harms, the Court must take into consideration that
the present stalemate of warring members, which apparently has
been reported in the trade press, will jeopardize interests of
the Limited Partnership.  The bottom line is that the limited
partners have the right to fire the general partner if they are

---

[3] Banerjee has raised his own claims like violations of the
1940 Advisors Act, but they are not appropriate for resolution at
this early stage of the litigation.

12

unhappy with Tuckerbrook, and have not done so.

Banerjee complains because Tuckerbrook is not paying him and is blocking access to confidential information. Tuckerbrook shall pay forthwith Banerjee's share of the management fees through the date of his termination, as Banerjee has demonstrated a substantial likelihood of success on this claim. (See Employment Agreement §8). Tuckerbrook argues that Banerjee has not demonstrated he is suffering irreparable harm from the non-payment. However, in balancing the harms to the parties, I take into account that the Agreement provides for payment even if there is termination for cause. Tuckerbrook also has a duty of good faith and fair dealing to Banerjee under the employment agreement. It breaks that duty by holding a financial club over Banerjee's head when it has presented no defense to payment of Banerjee's draw.

In addition, Tuckerbrook shall provide Banerjee full access to all books and records of the general partnership. Tuckerbrook shall keep Banerjee informed of all investments and capital calls. In turn, as he has agreed, Banerjee shall return the laptop computer and all property of Tuckerbrook, and shall not disclose any of Tuckerbrook's confidential business information.

The parties disagree as to whether or not managing members of a limited liability company owe each other a fiduciary duty under Delaware Law. Although the case law is sparse, the only Delaware case to address the issue has held that managing members owe each other a duty of loyalty which must be discharged in good

13

faith. VGS, Inc. v. Castiel, 2000 WL 1277372, *1, *4 (Del.Ch. Aug. 31, 2000). Both sides have a duty of loyalty to each other, the general partner and the limited partners to work together in good faith to protect the interests of the limited partnership.

### ORDER

Plaintiff's motion for a preliminary injunction [Docket No. 7] is **ALLOWED-IN-PART.** Banerjee's cross-motion for preliminary injunction [Docket No. 13] is **DENIED**. Banerjee's motion for dissolution of the stipulation and for an order directing immediate production and payment of management fees [Docket No. 31] is **ALLOWED-IN-PART**. The stipulation is dissolved and replaced by this Order.

S/PATTI B. SARIS
United States District Judge