# EXHIBIT A

JAMS ARBITRATION
No. 1400013543

Tuckerbrook Alternative Investments L.P.,
Claimant

v.

Sumanta Banerjee,
Respondent

FINAL AWARD

In this arbitration, the claimant, Tuckerbrook Alternative Investments, L.P., ("Tuckerbrook"), seeks a declaration that the settlement in litigation captioned Tuckerbrook Alternative Investments, LP, v. Sumanta Banerjee, United States District Court for the District of Massachusetts, C.A. No. 09CV11672-WGY, ("Banerjee II) is null and void. That settlement is contingent upon the respondent, Sumanta Banerjee ("Mr. Banerjee"), providing truthful deposition testimony.

Thus, the sole issue before the arbitrator is determination of the truthfulness of Mr. Banerjee's deposition testimony.

Background

Tuckerbrook, an investment advisor, is a Delaware limited partnership with a principal place of business in Marblehead, Massachusetts, and, at relevant times, offices in Stamford, Connecticut. Tuckerbrook manages hedge funds and private equity funds-of-funds. A hedge fund is a private investment fund open to qualified investors. A fund-of-funds usually invests in other hedge funds.

Mr. Banerjee is a former investment banker at JP Morgan and other companies who holds an MBA from Columbia University. In his counterclaim in one of the lawsuits between the parties, he identified himself as an investment portfolio manager who specialized in turnaround, distressed, restructuring, and credit investments.

The relationship between Tuckerbrook and Mr. Banerjee began in or around 2006 and involved Tuckerbrook/SB Global Special Situations Fund, L.P. (GSS) and Tuckerbrook/SB Global Distressed Fund, L.P. (GDF) (collectively the "Funds"). GDF

1

was a limited partner in GSS. In May, 2006, Tuckerbrook hired Mr. Banerjee to launch GSS and serve as its portfolio manager.

Disputes arose between the parties in early 2008 over various matters, including Mr. Banerjee's reluctance to provide Tuckerbrook with personal brokerage statements. On March 25, 2008, Tuckerbrook terminated Mr. Banerjee as portfolio manager for GDF and GSS.

On April 11, 2008, litigation began, which continues to the present. Initially, Tuckerbrook sued Mr. Banerjee in Massachusetts Superior Court. On April 15, 2008, Mr. Banerjee removed the case to federal court where it was captioned Tuckerbrook Alternative Investments Inc., L.P. v. Sumanta Banerjee, Civil Action No. 08-10636-PBS. ("Banerjee I") On September 23, 2008, the parties participated in a court sponsored mediation of that litigation under the direction of Magistrate Judge Timothy S. Hillman.

At the end of the mediation, the parties reported the case settled to the court. The parties reported on the record, among other things, that they had "essentially an 11-point substantive outline of a settlement, the details of which will need to be filled in by counsel." Included in the description of the settlement was Mr. Banerjee's non-competition, non-interference agreement. This agreement was detailed, including that Mr. Banerjee was not to interfere with "any relations Tuckerbrook has or will have with the limited partners to GDF or GSS or the third-party vendors or other affiliates of GDF or GSS" for 12 months thereafter. The parties also stated that they agreed to a mutual non-disparagement clause and mutual general releases. The parties also stated in court that the settlement agreement and its contents would be kept confidential except for disclosure of the non-competition and non-interference provisions to the limited partners of the funds.

During the September 23, 2008 hearing, counsel for Mr. Banerjee told the court that "the parties are in agreement that these (the points that had been recited) constitute all the material terms necessary for settlement", and that "all parties needed to authorize the settlement on behalf of Tuckerbrook and on behalf of Mr. Banerjee" were present. Mr. Banerjee was among those present.

After the September 23, 2008 hearing, counsel exchanged drafts of releases and engaged in occasionally acrimonious emails concerning additional provisions that the other party claimed were not part of the settlement. The material terms of the settlement did not change. A document entitled "Release and Non-Disparagement Agreement" was executed by the parties as of November 9, 2008. This document, among other things, stated that the parties had "mediated the Litigation to conclusion and reported the terms of the settlement on the record" on September 23, 2006. The Release and Non-Disparagement Agreement, signed by Mr. Banerjee and a principal of Tuckerbrook, stated that it was "effective as of September 23, 2006".

2

Execution of this document did not bring harmony to the parties. Rather, in October, 2009, Tuckerbrook initiated a second action against Mr. Banerjee in Massachusetts federal court. This case, captioned <u>Tuckerbrook Alternative Investments, L.P.</u> v. <u>Sumantra Banerjee</u>, Civil Action 09CV1672-WGY, (Banerjee II) alleged, among other things, breach of the settlement agreement reached after the September 23, 2008 mediation.

For purposes of this arbitration award, mention should be made of a related third action, in which Banerjee was not a party, initiated against Tuckerbrook in federal court in Texas by investors in GSS, Alkek & Williams, Ltd. and Albert and Margaret Alkek Foundation (collectively "Alkek"). Shortly after that action was filed, Tuckerbrook liquidated the GSS Fund.

Tuckerbrook prevailed on summary judgment in the Alkek case, and the Court of Appeals for the Fifth Circuit affirmed. Tuckerbrook then initiated a lawsuit against Alkek and its managing director, Scott Seaman, in state court in Connecticut alleging, among other things, that the Texas litigation had been baseless and that it had been filed to bring pressure on Tuckerbrook.

On or about June 29, 2011, Tuckerbrook and Mr. Banerjee reached a settlement of Banerjee II contingent upon Mr. Banerjee appearing for his deposition and providing truthful testimony. He was deposed on July 21, 2011.

On September 29, 2011, Tuckerbrook filed its timely Demand for Arbitration. The parties agreed to the undersigned as arbitrator and to the arbitration being administered by the Boston office of JAMS. The arbitrator held a telephone conference on December 19, 2011, and entered a Scheduling Order on January 6, 2012. The Settlement Agreement contains a choice of law provision stating that the agreement shall "in all respects be interpreted, enforced, and governed by the laws of the Commonwealth of Massachusetts".

In this arbitration, Tuckerbrook alleges that Mr. Banerjee's deposition testimony was untruthful; Mr. Banerjee denies that allegation. The parties agree that the allegation of lack of truthfulness invokes the provision of the Banerjee II Settlement Agreement which states that Tuckerbrook's timely objection to Mr. Banerjee's deposition testimony, unless resolved through discussion of the parties, is to be submitted to a neutral third-party arbitrator for "summary resolution based upon written submissions". Because of this unambiguous language, oral argument after the written submissions or the taking of testimonial evidence has not occurred. It was not requested by the parties or deemed warranted by the arbitrator.

At the initial scheduling conference, the parties agreed to dates for written submissions to the arbitrator. These dates were subsequently extended at the request of the parties. The parties have now submitted to the arbitrator the 193 page deposition transcript of Mr. Banerje and its attachments and exhibits, an initial

3

submission and reply brief from Tuckerbrook, an initial opposition and surreply brief from Mr. Banerjee, and numerous other exhibits. In a chart accompanying its initial submission, Tuckerbrook identified five areas of allegedly false testimony and listed exhibits demonstrating the untruthfulness of that testimony. The arbitrator's award is based on these documents, applying the applicable burden of proof and standard of review.

Discussion

Under the Settlement Agreement, any objection by Tuckerbrook to Mr. Banerjee's deposition testimony as untruthful "must be based upon a **contradiction** between Banerjee's testimony and other documentary evidence in Tuckerbrook's possession, custody or control". (emphasis added).

As a threshold matter, the parties disagree on the standard of review to be applied in determining truthfulness. Respondent argues that for claimant to prevail, it must establish; (i) "actual documentary proof that contradicts Mr. Banerjee's deposition testimony, *and* show (ii) that Mr. Banerjee "intentionally lied" or, in other words, committed perjury. Claimant contends that the appropriate standard is whether "(b)y testifying falsely, dodging questions and feigning lack of memory about key events, Mr. Banerjee breached the contract, destroyed the fruits of the contract for Tuckerbrook, and breached the duty of good faith and fair dealing".

The Settlement Agreement nowhere defines the term "untruthful". However, in clear and unambiguous language, the agreement states that any objection to the deposition testimony is to be based upon "a contradiction between" Mr. Banerjee's answers and "other documentary evidence" in Tuckerbrook's possession. Nothing in the Settlement Agreement suggests that the determination of truthfulness should be based on whether Mr. Banerjee intentionally lied or committed perjury, and the arbitrator therefore declines to apply that rigorous standard. The arbitrator also declines to assess truthfulness by considering whether Mr. Banerjee breached the implied covenant of good faith and fair dealing in his deposition answers. In addition, the arbitrator notes that the Settlement Agreement contains no provision with regard to materiality, and thus the Settlement Agreement must be construed to mean that an arbitrator's finding of *any* untruthful testimony warrants the declaration that the Settlement Agreement is null and void.

Based on the express language of the Settlement Agreement, my conclusions as to the truthfulness of the challenged testimony depend on whether Tuckerbrook has carried its burden of proving by a preponderance of the credible evidence that the testimony it challenges is "contradicted" by the documentary evidence it offers in opposition. In making that determination, I apply the ordinary dictionary meaning of "contradiction", i.e., "an assertion of the contrary". See, e.g., Webster's New Collegiate Dictionary (sixth ed. 1956). It should also be noted that in deciding whether a "contradiction" exists, Tuckerbrook's burden of proof may be satisfied through circumstantial as well as direct evidence, so long as based on the

4

submitted document evidence, and that the Settlement Agreement imposes no requirement that testimony the arbitrator finds to be untruthful also must be found to be material before the Settlement Agreement can be declared null and void.

The Settlement Agreement states in relevant part:

On the sixth day after Delivery (of the deposition transcript), Tuckerbrook understands, agrees and authorizes counsel of record for Bannerjee to file the Stipulation with the Court in the Litigation through the ECF system, unless Tuckerbrook timely objects to Banerjee's testimony as untruthful. Any such objection must be based upon a contradiction between Banerjee's testimony and other documentary evidence in Tuckerbrook's possession, custody or control. If Tuckerbrook raised such an objection, the parties shall have seven (7) days within which to resolve the discrepancy either through discussion or submission of the discrepancy to a neutral third-party arbitrator for summary resolution based upon written submissions. If the parties cannot resolve the discrepancy and the third party arbitrator rules that Banerjee's testimony was untruthful, this settlement shall be null and void, the Payment shall be returned to Banerjee and the litigation shall continue.

As noted, Tuckerbrook asserts five areas of allegedly untruthful testimony. Each will be addressed in the order set forth in claimant's submission entitled "Summary Chart of False Testimony".

First, Tuckerbrook claims that Mr. Banerjee was untruthful when he testified that he did not believe the parties had a firm settlement after the September 23, 2008 mediation. Tuckerbrook cites pages 56-57 and 122-125 of Mr. Banerjee's deposition in making this claim. The key testimony on those pages is the following:

Q. And do you recall the settlement being arrived at some point in September of 2008, Does that ring a bell to you?
A. We had sort of, I guess, a premise about the general framework of a settlement, but I think the actual settlement was done when we all signed it.
    . . . .
Q. And do you recall. . . . on September 23rd, 2008. Do you recall reaching a settlement in court on or around that date—
A. Yes.
Q. –relating to the Tuckerbrook dispute.
A. Yes.

(Dep. at 56-57)

5

> Q. Now, you settled with Tuckerbrook at a mediation, correct? In September of 2008? . . . .
> A. We had, as I said before, we had a framework for the settlement, but the settlement actually got executed in November sometime.
> . . . .
> Q. And when you were trying to reach Mr. Seaman the day of the discussions in court, did you try to reach him before you had reached the agreement? . . . Or was it following the consummation of the agreement
> A. It was before, and he was not available. A lot of times he wasn't available. He's a busy guy.
> Q. Right. When you finally did speak to him the nest day---I think you said he called you.
> A. Uh-huh. He was returning my call from the day before.
> Q. Did you talk about---you obviously told him about the terms of the settlement, did you not? Mr. Susswein: Objection.
> A. It wasn't, again---you know, we had reached settlement before. So in my view it was one of the frameworks for the settlement, which we hadn't, which was there. And there were emails subsequent to that between counsels, you know, basically, saying that there is no settlement, let's go back to the judge. . . . So I did not feel that---you know, maybe the settlement was not really there. I mean, there was a framework for the settlement, but we hadn't quite gotten there, maybe.
> Q. I just want to make sure---
> A. And I did talk to Mr. Seaman, yes. . . . . . (Dep. at 122-125.)

To support its assertion, Tuckerbrook submits (i) the sealed transcript of the September 23, 2008 hearing before Judge Hillman, (ii) portions of Mr. Seaman's deposition testimony, and (iii) Mr. Seaman's notes of certain communications he had with Mr. Banerjee. Those documents establish untruthfulness.

As noted above, the parties reported on the record in open court after the mediation on September 23, 2008, that all material terms of an 11 point settlement had been reached, and those terms were described to the court in considerable detail. They included, among other things, a non-competition, non-interference agreement as to Mr. Banerjee beginning that day and continuing for 12 months. The settlement also included mutual non-disparagement and confidentiality provisions.

Several times during the hearing before Judge Hillman, with Mr. Banerjee present, counsel noted that September 23 was the "date of settlement". While it was contemplated that further memorialization of terms of the settlement would occur-- not uncommon with regard to the language of releases, non-disparagement provisions, and the like---to the extent Mr. Banerjee suggested at his deposition that September 23 was not the date of settlement, he was not testifying truthfully. This conclusion is buttressed by the fact that Mr. Banerjee participated in the mediation, approved the terms of settlement, and heard counsel describe it to the court as a settlement containing all material terms.

6

Tuckerbrook's second objection to Mr. Banerjee's deposition testimony is his alleged "evasive testimony and feigned lack of memory concerning the sharing of his false allegations of '40 Act violations with Alkek." In support of this assertion, Tuckerbrook relies on testimony within pages 53-55, 111, 138-44 and 150-153 of the deposition. As evidence to contradict Mr. Banerjee's testimony, Tuckerbrook cites (i) emails to Alkek controller Sandra Bacak's home email address, February 2009 (Dep. Exhibits 21 & 22, appendix exhibit 1); and (ii) Scott Seaman's deposition testimony within pages 103-06 and 227-28 of his transcript.

The challenged testimony includes the question: "What was the basis for your belief that Tuckerbrook thought that Alkek may sue it for breach of fiduciary duty and '40 act violations as of July 7, 2008"? Mr. Banerjee responded: "I can't---it's been, again---the best of my recollection at this time, I remember, certain, some LP's, and I don't exactly know who it was, was talking to both sides, I believe. And I believe that was their view, that Tuckerbrook was worried about this part of things. That's what I remember, best I can remember. (Dep. at 110:16-111:17).

Mr. Banerjee was also asked: "And do you recall discussing the '40 Act violation or alleged '40 Act violations with any of the investors in GDF or GSS prior to the time you filed the counterclaim, which was in April 2008? He answered: "No".

He was also asked: "But after---you obviously had learned about the possibility that what had been done by Tuckerbrook was a violation of the 1940 Act by the time that counterclaim was filed, exhibit 8, correct?" He answered: "Correct".

He was then asked: "My question is: subsequent to filing the counterclaim alleging, among other things, violation of the '40 Act, did you discuss that subject with Mr. Seaman?" He answered: "I did". The next question was: "Can you tell me when you discussed that with Mr. Seaman?" He answered: "I do not recall the exact dates and time. Sometime around that time".

The following colloquy then occurred:

Q: Did you ever send Mr. Seaman or anyone else at Alkek any information concerning the actions that related to the alleged '40 Act violations?

A. What time period?

Q. Anytime after April 15 or so of 2008.

A. I may have.

Q. Do you recall why you did that assuming you did?

7

A. I think they had requested some information.
(Dep. at 53:4-55:8).

With regard to the allegedly untruthful testimony about his email communication to Sandra Bacak, Alkek's controller, the deposition colloquy was as follows:

Q. So let me get this straight: Is this a document that you had previously sent your lawyers, or is it a document that you had sent to the LP's?

A. I had sent it to my lawyers for sure, but I can't remember or recall if I'd also sent it to the LP's or not.

Q. Do you recall sending something to the LP's that said that in January 2007 Tuckerbrook tried to charge legal expenses and marketing expenses to the fund?

A. I can't recall.

Q. So what is your best memory as to the circumstances that caused you to send this to Ms. Bacak's home email address in February of 2009?

(objection omitted)

A. I think Ms. Bacak had asked me for documents that had previously been sent to Scott and to Brandon. And as far as I can remember---this is as far as---it's been a long time---all I think I did was forward whatever I had sent. I did not create this document for Ms. Bacak. So this was stuff that was already sent to Scott and to Brandon when they requested a timeline as to the best of my memory. I really cannot remember all of the details. (Dep. at 143:3-144:6).

Tuckerbrook's challenge to this testimony centers on Mr. Banerjee's lack of recollection, which Tuckerbrook claims is feigned. The difficulty with Tuckerbrook's argument is that the documentation it includes in support of its position raises only the *possibility* of feigned lack of memory. This is insufficient to satisfy Tuckerbrook's burden of proof in demonstrating the contradiction required by the Settlement Agreement. Thus, I agree with Mr. Banerjee that Tuckerbrook has failed to prove that he was untruthful when he stated that he could not "remember all of the details"; that he could not recall sending a particular document in January 2007, or that, although he could recall sending something to his counsel, he could not remember sending it to the limited partners.

Tuckerbrook's third claim is that Mr. Banerjee testified falsely about his

8

knowledge and involvement in the Texas Alkek litigation in responses on pages 117-19 of the deposition. Specifically, Tuckerbrook argues that Mr. Banerjee falsely testified in the following colloquy.

> Q. Do you understand that the lawsuit that Alkek filed that's Exhibit 12 had to do with whether they---with their withdrawal rights in GSS?
> A. *All I knew about it at that time was Alkek was asking for their money back, and that's all I knew about it. (emphasis added).* And from what I can recall Alkek had a separate something or the other in the class interests of GSS that gave them liquidity, is what I remember. I don't---I have no knowledge---at that point, I mean, I don't remember what this---and what provisions and all this---and I just didn't follow it, because I was busy with my life.
> Q. .... Did you speak to Alkek's counsel or Alkek directly about the validity of their position in the lawsuit?
> A. ... no, not that I can recall.

Tuckerbrook argues that the falsity of this testimony is shown on the next page of his deposition where Mr. Banerjee allegedly "dodged" questions concerning his "direct or indirect" involvement in the activities of the GSS GP.

> Q. My question to you is: Following your termination from Tuckerbrook, did you cease to be directly or indirectly involved in the activities of the general partner of the GSS fund?
> A. That's, again, kind of a loaded question, I would say.
> Q. Why is it loaded?
> A. Because I don't know what "indirectly" exactly means .... Id. at 120.

Tuckerbrook claims that Mr. Banerjee's use of the phrase "kind of a loaded question" displays greater knowledge of the Alkek lawsuit than Mr. Banerjee acknowledged. However, no documents Tuckerbrook submitted to the arbitrator squarely contradict Mr. Banerjee's testimony that he knew no more about the Alkek litigation than that the Alkek entities wanted their money back. Although Tuckerbrook argues that Mr. Banerjeee and his counsel corresponded with Alkek's litigation counsel during the relevant time period, that information standing alone does not provide evidence of what was discussed. Thus, Tuckerbrooks' third assertion of untruthful testimony is too speculative to satisfy its burden of proof.

Tuckerbrook's fourth assertion is that Mr. Banerjee falsely testified (on pages 166-168 of the transcript) when he denied that he provided information and confidential documents to a financial writer, Sarah Klein, who wrote an article critical os John Hassett, co-founder and managing principal at Tuckerbrook, in a publication entitled "Alternative Investment News".

> Q. You'd mentioned earlier today about speaking to a journalist named Sarah something. Is this the woman, Sarah Klein?
> A. Yeah.

9

> Q. So did you supply the information that she used in this article?
> A. No.
> Q. You didn't
> A. I don't think so.
> Q. Do you have any idea who did?
> A. Probably court filing. (objection omitted)

Tuckerbrook argues that an email from Mr. Banerjee to Scott Seaman dated September 5, 2008, stating "FYI – enjoy. Have a great weekend! This is "hot off the press" contradicts the above testimony. The email attached Klein's article. Tuckerbrook claims that after Mr. Banerjee was confronted in his deposition with the fact that he had received Klein's pre-publication article, he acknowledged that Klein "used to send me articles that she was going to publish from time to time." (Dep. at 166.)

In other words, Tuckerbrook argues that the evidence of contradiction is the email to Mr. Seaman and the concession that Mr. Banerjee's relationship with Ms. Klein was such that she sent him articles "from time to time". Again, this evidence is speculative. As such, it is insufficient to satisfy Tuckerbrook's burden of proving that Mr. Banerjee testified falsely in saying he did not provide the information Klein used in her article.

Tuckerbrook's fifth assertion is that Mr. Banerjee provided false testimony concerning 'his efforts to conceal assets and misrepresent his financial condition to the federal court in the prior litigation". In support of this assertion, Tuckerbrook relies on testimony within pages 58-69 and 81-85 of the deposition.

In that testimony, Mr. Banerjee was asked, among other things, about an affidavit he signed on July 23, 2008, which he filed in Banerjee I in support of his motion seeking immediate release of $215,753 in management fees. A "balance sheet' attached to the affidavit stated that Mr. Banerjee had $9 in his savings account; $3831 in a checking account, and $1103 in a brokerage account. When asked at his deposition whether that "was true", he responded "That's what it says, yeah. " Again, he was asked "Was that true?". He responded: "At that point, it probably was where we got the numbers from." These responses are contradicted by the documents submitted to the arbitrator. For example, a June 26, 2008 email from Mr. Banerjee to his wife states: "So why the hell did he (apparently, Mr. Chodos) do it in a way that we have to disclose? I thought the entire idea was to protect it and keep it confidential---that we do not have any assets. That is what he had said ..... "

In his testimony, Mr. Banerjee also stated that he gifted money to his father in March, 2008, "well before" his termination. This statement is contradicted by, among other things, an email dated the day of Mr. Banerjee's termination, entitled "nri account" ("nri", according to Mr. Banerjee, meant his non-resident Indian

10

account at Citibank). In that email, on which Mr. Banerjee was copied, his wife questioned an account manager at Citibank:

"Sanfay, I was expecting to hear from you yesterday. Here is what I want to make sure was accomplished yesterday. 1. The funds deposited were converted to rupees as of yesterday. 2. Did you receive the check that we sent out on Friday? 3. Start the process to remove Salil Banerjee from (the) account. As I did not hear from you yesterday---I am on the phone with NRI customer service and they are now telling me that there is a HOLD on the funds???????We specifically gave you CASHIERS checks as per your advice---so that THIS WOULD NOT BE THE CASE----

**The most IMPORTANT thing is that the funds got converted as of yesterday 3/24,** as you had reassured my husband on Friday **when he was in your office.**

PLEASE CLARIFY! ! ! ! ! ! ! ! " (bolding added)

The tone and substance of this email demonstrate that the Banerjees wanted the funds at issue to be converted to rupees on March 24, 2008, the day *before* Mr. Banerjee's termination. Mr. Banerjee knew that there existed the likelihood of termination if he failed to provide the trading records requested by Tuckerbrook, as he acknowledged in his deposition. Thus, the submitted documents show that Mr. Banerjee testified falsely when he said that the money had been transferred in March "well before" his termination, and that the transfer of funds at that point was intended as a gift to Mr. Baneerjee's parents.

Documents submitted to the arbitrator show that on April 29, 2008, shortly after Tuckerbrook initiated litigation against Mr. Banerjee, he signed a Certificate of Formation of ZBAC LLC, ("ZBAC") filed on May 9, 2008 with the Delaware Secretary of State. ZBAC had been formed a few days earlier with the assistance of Adam Chodos, a specialist in asset protection, and Michael Goldman, an attorney with similar expertise. Documents suggest that ZBAC issued a loan to Mr. Banerjee for more than 19 million rupees, or $450,000, secured by Mr. Banerjee's property. Mr. Banerjee made no mention of this loan or the mortgage that secured it in his affidavit. Oddly, Mr. Banerjee's recorded mortgage from ZBAC LLC was released eight days before the filing of his July 23, 2008 affidavit.

After his employment was terminated and because of the resulting litigation, Mr. Banerjee testified that he attempted to retrieve some of the funds he had transferred to India but was unable to do so because of Indian currency controls. For example, he was asked: "Did you transfer money to India with intent that it be loaned to ZBAC?" He responded: "I don't understand the question. I had—I had said before, in my prior testimony, that I had transferred or gifted my father and my mother the money. We tried to get some of that back for the litigation, but it was very difficult. India has all sorts of capital controls and all sorts of bureaucracy attached to it. And as a result, we couldn't get it back." (Dep. at 84)

11

The documents provided the arbitrator by Tuckerbrook contradict that testimony. Mr. Banerjee testified that ZBAC was formed "after the litigation ensued and I needed money, and I had just gifted some money, which I really could use at that time, to my dad. But to get back money from India, it had to---the process is very cumbersome. It had to be a loan. That's what we were advised, and it had to be an entity". Dep. at 82:21-83:3.

On the basis of the contradiction between Mr. Banerjee's deposition testimony and the documents Tuckerbrook lists on its summary chart, I conclude that Tuckerbrook has carried its burden of establishing that Mr. Banerjee was untruthful when questioned at his deposition about his assets and financial condition.

In its Reply Brief, Tuckerbrook asserts an additional claim of false testimony, namely, Mr. Banerjee's explanation of why he could not appear at a deposition.

> Q. Did you ever speak to the lawyers retained by Alkek and Williams for the litigation that it commenced against Tuckerbrook?
> A. Yeah, I believe they had contacted me in India sometime prior to my deposition---I believe; I can't recall exactly when. And I had---I think there was some other matter where they were on the phone when I was---*I think I had to appear for a deposition and I couldn't because of my current job situation in India.* . . . (Dep. at 86-87) (emphasis added)

In its Reply Brief, Tuckerbrook claims the italicized statement is contradicted by the assertion in his initial opposition brief that Mr. Banerjee "offered to appear at his deposition by video conference or telephonically, when he was unable to travel due to illness, but Tuckerbrook refused this offer". (Resp. brief n. 1).

As to this testimony, Tuckerbrook has not shown the requisite contradiction. As the sur-reply brief states at page 5, Tuckerbrook noticed Mr. Banerjee's deposition in the Alkek litigation on July 30, 2009, to be taken in August, 2009. At that time, Mr. Banerjee had begun work in India and was not scheduled to return to the United States until December, 2009. Thereafter, Mr. Banerjee was scheduled to return on December 15, 2009, and to have his deposition taken then. However, Mr. Banerjee's medical condition in December prevented that scheduled return from occurring, as set forth in an affidavit and its attachmens. Thus, Mr. Banerjee's seemingly inconsistent statements about the reason he could not appear for his deposition can be reconciled.

AWARD

For the foregoing reasons, it is awarded and determined that the claimant, Tuckerbrook Alternative Investments L.P., has carried its burden of proving that the respondent, Sumanta Banerjee, testified untruthfully at his deposition. Therefore, the Settlement Agreement dated June 29, 2011 is declared to be null and void.

There shall be no award of attorney's fees or costs.

*Margaret R. Hinkle*

Margaret R. Hinkle, Arbitrator

Dated: May 9, 2012

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

Re: Tuckerbrook Alternative Investments LP / Banerjee, Sumanta
Reference No. 1400013543

I, Paul D. Gelinas, not a party to the within action, hereby declare that on May 09, 2012 I served the attached FINAL AWARD on the parties in the within action by facsimile and depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Boston, MASSACHUSETTS, addressed as follows:

Sean T. Carnathan Esq.
O'Connor, Carnathan & Mack, LLC
1 Van De Graaff Drive, Suite 104
Landmark One
Burlington, MA   01803
Fax: 781-359-9001
   Parties Represented:
   John Hassett
   Tuckerbrook Alternative Investments LP

Marc Susswein Esq.
Liddle & Robinson
800 Third Ave.
8th Floor
New York, NY   10022
Fax: 212-687-1505
   Parties Represented:
   Sumanta Banerjee

I declare under penalty of perjury the foregoing to be true and correct. Executed at Boston, MASSACHUSETTS on May 09, 2012.

_____
Paul D. Gelinas