IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

TUCKERBROOK ALTERNATIVE              )
INVESTMENTS, LP,                     )
Plaintiff & Counterclaim Defendant   )
                                     )
v.                                   )        Case No. 1:12-cv-11643
                                     )
SUMANTA BANERJEE,                    )
Defendant & Counterclaim Plaintiff   )
_____ )

**COUNTERCLAIM PLAINTIFF's OPPOSITION TO MOTION TO DISMISS**

Counterclaim Plaintiff Defendant Banerjee ("Plaintiff"), hereby submits his opposition to Counterclaim

Defendants'("Defendant") Motion to Dismiss the Complaint with Prejudice. The Plaintiff's Complaint not

only meets but exceeds the standards governing the form of a complaint contemplated by Federal Rule of

Civil Procedure 8(a)(2) and Fed Civ (12)(b)(6) and the Complaint sufficiently alleges harm and damage.

Accordingly, Defendant's motion should be denied. Also, the Plaintiff respectfully requests the Court, due

to his *pro se* status, leave to amend his Complaint if needed.

**BACKGROUND**

1. In late 2005, Banerjee, who has over 15 years of experience at leading investment banking and

   investment management organizations, left a large CT-based investment manager, where he had been

   serving as managing director and portfolio manager for two distressed private equity funds, in order to

   start his own funds. By way of background, Mr. Banerjee is an Ivy League educated professional who

   had spent most of his career at top tier institutions until he had the misfortune of meeting Tuckerbrook

   and John J. Hassett to start his own business as a 50 percent owner.  Mr. Hassett is a serial litigant

   (unbeknownst to Mr. Banerjee since Mr. Hassett lied about his past litigation in disclosure documents

and marketing materials of the firm).   Mr. Banerjee would have never tarnished his blue-chip background by associating with a character like Mr. Hassett if he had the slightest knowledge of Mr. Hassett's "checkered and colorful" background of litigation (where he had been sued by investors and currently facing charges of stealing millions of dollars of investors' money in a related lawsuit in CT against Tuckerbrook and John J. Hassett).

2.   To start his own fund, Banerjee needed a partner to shoulder start-up costs and provide mid- and back office services.  He was introduced to Jay Yoder of Tuckerbrook, a relatively tiny player in the industry, with only $25 million AUM.  In May 2006, after months of negotiations, Banerjee and Tuckerbrook entered into an agreement to open a series of distressed funds.

3.   Tuckerbrook and Banerjee created three funds, each in the form of Delaware limited partnerships:  (1) Tuckerbrook | SB Global Special Situations Fund, L.P. ("GSS"); (2) Tuckerbrook | SB Global Special Situations Fund, L.P. ("GDF"); and (3) TAI-SB Sun Capital Side Fund, L.P. ("Side Fund") (collectively the "Funds").  Banerjee's initials "SB" were included in the names of each fund to designate 50-50 nature of the ownership.

4.   Banerjee and Tuckerbrook recognized that Tuckerbrook had no experience in distressed investing, so the GDF LPA specifically named Banerjee as "Portfolio Manager".  Also, Banerjee executed an employment agreement with Tuckerbrook which entitled him to 50% of the management fees of the funds he created.  Accordingly, Banerjee wore this second hat, aside from the one that he wore as the 50% managing member of the GP Entities.  The GP entities were the owners of the Funds.

5.   Shortly after Banerjee joined and created the GP entities, Tuckerbrook|SB GP, he was told that Jay Yoder was no longer going to be the CIO nor was he to be in the management structure, i.e. Board of Directors or Executive Committee and that John J Hassett was assuming the CEO role.  Further, Jay Yoder was going to be only the portfolio manager of the real assets fund and a member of the GP of that real assets fund.  Banerjee had focused his due diligence of Tuckerbrook, based on Jay Yoder's involvement, i.e. decided to take on Tuckerbrook as a partner based on Jay Yoder's senior involvement.  John J. Hassett was in charge of another entity Radius Capital LLC and had been previously only

peripherally associated with Tuckerbrook (as Mr. Banerjee understood it), and as of June 2006, was now becoming a managing member of Tuckerbrook. At that time, June 2006, **none** of John Hassett's previous litigation proceedings **were never disclosed to Banerjee or to the investors** as is required in the Due Diligence Questionnaire[1](DDQ). During the 2008 case's discovery phase, several background items from John Hassett's past came to light specifically, litigations such as Lind-Waldock, AT/Com, and investor lawsuits like Paarlberg. None of these previous litigations were ever disclosed in formal questionnaires like the DDQ thereby misleading investors; a blatant violation of the Investment Advisers Act of 1940. In addition, Mr. Hassett has also sued his counsel, Bingham, McCutchen.

6. The LPs of the Funds expected (and indeed insisted) that Banerjee (who had a verifiable track record in investments) and no one else should be Portfolio Manager, so they demanded on the insertion of a "Key Man" provision that would allow them an escape hatch if Banerjee ceased to be the Portfolio Manager. Please see below an excerpt of a letter from Brandon Evans, of NCR Corporation (in May 2008) which states that

> *"The Limited Partners invested in these funds with the expectation that they would be managed by Sumanta [Banerjee], and it is our clear preference that Sumanta [Banerjee] function as the Portfolio Manager of all the funds. If a settlement can be reached under which Sumanta [Banerjee] is reinstated as Portfolio Manager of the funds, the Steering Committee will not seek the fee adjustments outlined in paragraph 4. If Sumanta [Banerjee] is not reinstalled as Portfolio Manager, then the Steering Committee will request the changes outlined in paragraph 4."*

This letter demonstrates the importance of Banerjee to the performance and structure of the funds he created. **The intellectual property and trade secret was not Tuckerbrook's property but belonged to the General Partner – of which both Banerjee and Tuckerbrook were Managing Members.**

---

[1] A due diligence questionnaire is an important document for an investor to understand the background of the management and employees as well as understanding the details of the fund. Misrepresentation in the DDQ is a violation of the Investment Advisors Act of 1940.

7. As a result of Banerjee's involvement with the Funds grew the fund from $0 to $125 million, from May 2006 to March 2008.

8. Banerjee was a portfolio manager with the Investment Manager which was Tuckerbrook Alternative Investments, however, the GP which Banerjee was a 50% member of, never hired Tuckerbrook as an Investment Manager requiring them to execute the Investment Management Agreement (IMA) with Tuckerbrook. **Tuckerbrook tried to steal the Funds from Mr. Banerjee by unilaterally executing the IMA,** which Judge Saris found was not valid, as did the LPs. **Litigation between Banerjee and Tuckerbrook ensued over control of the Funds in April 2008.** In August 2008, the LPs with an 80% vote eventually wrested control from Tuckerbrook and fired Tuckerbrook from their role as the purported Investment Manager. The LPs also removed the GP entity of GDF and assumed control. The LPs wrote to Tuckerbrook and notified them in a letter from Steve Klugman, of Debevoise and Plimpton.

9. Tuckerbrook, as the purported Investment Manager of the Funds, was responsible for the back office responsibilities, including collecting the Management Fees for the GPs of the Funds. Tuckerbrook had neglected, failed and refused to pay Banerjee any of his quarterly Management Fees for the second and third quarters of 2008. The Hon. Judge Saris had ordered Tuckerbrook to have all outstanding Management fees paid to Banerjee, during one of the many appearances in Court. However since litigation was continuing, the parties agreed to keep the Banerjee's share of the management fees in escrow with the Court. Banerjee entered into the Final Settlement Agreement in consideration for the release of the escrowed management fees.

10. Banerjee's contacts—which pre-existed his relationship with Tuckerbrook—accounted for over 85% of the capital invested in the Funds.  Banerjee built the Funds, being responsible for over 85% of the capital committed.  Tuckerbrook had almost no contacts of its own until Banerjee provided his own list of nearly 5,000 contacts.  This list is the one that Tuckerbrook has repeatedly but falsely made claim to. Additionally, after the LP's took control of the GP and removed Tuckerbrook from that role, the LP wrote a letter ordering Tuckerbrook to cease and desist from all Management activities as it related to

4

the Funds. **Thus the investors were no longer clients of Tuckerbrook when Banerjee entered into the Settlement in 2008.**

11. Towards the end of the relationship with Tuckerbrook and during the litigation with Tuckerbrook, Banerjee became aware of *several violations of the 40's Act of the Investment Advisors Act by Tuckerbrook*. These violations included omissions of previous litigations in Fund offering documents, financial transfers in violation of Fund documents and misrepresentation of AUM in SEC filings of HT Capital (in conjunction with the Hardt Group). In fact, Banerjee had countersued Tuckerbrook for Violations of the 40's Act of the Investment Advisors Act along with various breaches of contract, etc. The previous litigation of John Hassett and Paarlberg (an investor) which was not mentioned in the DDQ, in an effort to mislead Banerjee and the Investors.

12. Tuckerbrook cannot lay claim to any of the material that was used in marketing because the materials were marketing materials, which Banerjee created, and which relate to his underlying managers. In addition, all the marketing materials and other related files that were created with regard to the Funds were the property of the GP, which was jointly owned by Tuckerbrook and Banerjee. Also, the Honorable Judge Patti Saris had ruled, that all the work products belonged to the General Partner of the Funds and had ordered Tuckerbrook to release all information to Banerjee, based on his status as a Managing Member of the Funds. Besides, Counsel Carnathan has neglected to inform this Honorable Court that there are mutual releases in place which prevent either party, Banerjee or Tuckerbrook, to file lawsuits against each other for actions that took place prior to Settlement.

13. Banerjee and Tuckerbrook continued to litigate until September of 2008.

14. Finally, the parties agreed to a court-led mediation which was conducted on September 23, 2008. During that mediation, the Judge required the parties to go on record and delineate terms of a settlement that was to be finalized with additional negotiations, agreements and releases. At the conclusion of the Mediation, although the Parties had agreed on certain terms, it was unclear whether the final settlement had occurred, in light of prior history. There were several draft settlement agreements, confidentiality agreements, releases and mutual non-disparagement clauses exchanged and Mr. Banerjee's co-counsels

– Thomas Gallitano (Conn Kavanaugh) and Douglas Hirsh (Sadis and Goldberg) fought bitterly with Messrs Carnathan and O'Connor over the Settlement Documents. As Parties could not agree, the two sides decided to go with the settlement transcript on record which then became the Final settlement Agreement on a "de facto" basis. In November 2008, Counsels for both parties threatened each other that "settlement had not occurred." **The Settlement Agreement was signed and became Effective (as per O'Connor who was Tuckerbrook's counsel in emails to Banerjee's counsel)** and Joint Motion to release escrowed management fees to Banerjee was done on November 7, 2008, and the money was released on Nov 21, 2008.   **Thus, the Settlement became effective in November 2008 and not September as asserted by Tuckerbrook Counsel.**   Mr. Banerjee has not disclosed the terms of the Settlement but Mr. Hassett disclosed its contents in May 2009 and Mr. Carnathan has provided it to Alkek Foundation in July 2009 and then claimed damages. Carnathan had requested permission from Banerjee through Banerjee's counsel to be able to release the Settlement Agreement and all accompanying documents to the Alkek Group as a disclosure document of Alkek's litigation against Tuckerbrook, C.A. no 4:08-cv-3501.

15. The Final Agreement, was the Court Transcript, on a de facto basis which also became the Settlement date on a de facto basis, occurring on November 7, 2008, when it was actually signed. There were also standard releases, disparagement and defamation clauses that were included as part of the Settlement Agreement in addition to the Agreement that was memorialized in the Court. This final Agreement was NOT SIGNED until November 7, 2008.

16. On or about November 26, 2008, Alkek brought a suit against Tuckerbrook and related entities in the United States District Court, Southern District of Texas captioned Alkek & Williams LTD et al. v. Tuckerbrook Alternative Investments, LP. No. 4:08-cv-3501 (the "Alkek Litigation"). In this matter, Alkek claimed that Tuckerbrook did not abide by the terms of the Limited Partner Agreement and did not redeem Alkek's investment. There is a current case in the Superior State Court of CT with the two parties yet again, notated as FST:cv-11-6010952-S. Alkek, with the backing of forensic accounting,

has alleged that Tuckerbrook and Hassett have withdrawn millions of dollars of investors' money and
continue to use some to fight Banerjee in violation of the governing documents.

17. In the Alkek Litigation, Alkek asserted claims for (1) the breach of the Limited Partnership Agreement
    of the Fund, (2) a declaration that Alkek had withdrawn from the fund as of May 31, 2008 and (3)
    sought an accounting of the Alkek capital accounts (4) failure of Tuckerbrook to redeem the funds from
    the investment program to which they had invested (5) in a follow-on appeal, there was evidence
    showing that instead of returning Alkek's capital in accordance with the Limited Partnership agreement,
    Tuckerbrook had actually withdrawn millions of dollars.

18. During discovery phase of the Alkek Litigation, Banerjee was deposed but due to illness and the fact
    that Banerjee had moved his place of residence to Kolkata, India, he was not able to physically appear
    for the deposition.

19. When Tuckerbrook was unable to obtain Banerjee's deposition for its defense against Alkek ( and
    refusing to take the deposition over phone or video from India), Tuckerbrook resorted to filing a case
    against Banerjee, captioned Tuckerbrook Alternative Investments, LP v. Sumanta Banerjee, no. 1:09-
    cv-11672-WGY ("SB Litigation").[2] This case was the predecessor to the current case. The current case
    is virtually identical to the predecessor case.  Hassett has just made good on his previous threat in an
    email to Banerjee in 2008 "I will sue you over and over" again using the baseless meritless lawsuit
    (with no damage claim since he had settled for $12500 and a deposition) to use as a financial club
    against Banerjee to extract a favorable Affidavit to use in the Alkek case.

20. Due to Mr. Banerjee residing in India, in order for him to be served correctly, as India is a member of
    the Hague Convention, Tuckerbrook was required to follow a strict procedural format. Tuckerbrook
    admits that it did not comply with the Hague Convention, but explains that that proper service would

---

[2] It is worth noting that when it filed its Complaint, Tuckerbrook was urgently seeking to force Mr. Banerjee to
return to the U.S. to be deposed in Tuckerbrook's litigation with the Alkek Foundation, a limited partner in the
investment funds, in which fact discovery was nearing an end. Mr. Banerjee's documented health problems
prevented that, but he repeatedly offered to testify by telephone or videoconference. Tuckerbrook refused and filed
this lawsuit instead.

take time—which is no justification at all. *See Furukawa Elec. Co. v. Yangtze Optical Fibre & Cable Co.*, 2005 WL 3071244 (D. Mass. 2005) (that Hague Convention service may be "burdensome and expensive" does not excuse compliance). Even in this case, Tuckerbrook has refused to comply with the Hague service process.

21. The Plaintiffs, Tuckerbrook, have been on a path of harassment and coercion of Banerjee since this case was started in October of 2009. This Abuse of Process has been demonstrated repeatedly over the years through the various activities of Tuckerbrook, Hassett and his counsel. In order for the Court to understand the pattern that Tuckerbrook has been following for the past nearly four years, it is important to document the repeated actions of the Plaintiff.

24. The pattern of harassment, associated with the abuse of process and malicious use of prosecution began in November 2009, shortly after Tuckerbrook filed the SB Litigation. In order to coerce Banerjee to appear for the deposition, Tuckerbrook hired agents (Always) in India to follow and intimidate Banerjee and his family. In a rare show of bravado, the agents actually barged into Banerjee's house and harassed his house workers.

25. In January and February 2010, the agents of Tuckerbrook even went so far as to follow Banerjee and his family around town. This type of harassment is not tolerated in India and is illegal. As a result Banerjee filed charges against the agents (Always Investigations) and Tuckerbrook in India, in order to cease the harassment. A formal investigative report that was filed in Kolkata, India. Tuckerbrook then resorted to alternate tactics. Tuckerbrook had directed the Agents to make disparaging and defamatory comments about Mr. Banerjee to his doctor, to his house workers, to his guards and to the police (the Agent was merely doing what they were told). This will again be part of Discovery in the form of depositions and other email communications.

26. On or about August 6, 2010, TB's Hassett sent via email a settlement offer and attached an affidavit as well (for Banerjee to sign). Hassett also sent over, to Banerjee's counsel at that time, an affidavit with the items that were most important to him. The entire affidavit was filled with outright lies and misrepresentations. It addressed none of the claims made in the civil case of the SB Litigation. The

abuse of process was trying to extract a wrongful Affidavit (which along with many other items will be part of Discovery) to use in the Alkek case to extract millions of dollars of compensation as he mentioned on a call on or about August 10, 2011. Mr. Hassett went so far as to state the reasons why he has sued Mr. Banerjee --- since he wanted to extract tens of millions from Alkek, NCR, etc. and needed Mr. Banerjee to say that he colluded with the investors to dislodge Tuckerbrook from their role as Co-General Partner of the Funds with Mr. Banerjee.

27. Indeed, the settlement conversations continued from August 2010 until a settlement was signed in June of 2011. As a condition of this settlement, Banerjee was to appear for a deposition in July 2011. Additionally, Banerjee was to pay Tuckerbrook a sum of $12,500. This was a far cry from the over $250,000 that was demanded as a relief of the SB Litigation.

28. The deposition of Banerjee, was conducted on or about July 21, 2011. During the six hour deposition, there were only two questions that pertained to the claims of the SB Litigation. All of the other questions centered on Banerjee's relationship with the investors of the Fund, of which Tuckerbrook and Banerjee had been equal General Partners. These two questions were (1) whether Banerjee had revealed the terms of the Mediation Hearing (which ultimately formed the basis of the 2008 Litigation Settlement Agreement) to one of the Limited Partners of the Fund; (2) had Banerjee disparaged Tuckerbrook and Hassett in an email (dated July 2008). This email was governed under the release of the 2008 Settlement in either September or November 2008.

29. By definition, a deposition is to be truthful, under punishment of perjury for false statements. This deposition that was taken in 2011 was a blatant attempt to obtain further information for Tuckerbrook to use in its case against Alkek, in the CT Superior Court.

30. Tuckerbrook was not satisfied with the information that Banerjee provided during the deposition as they were not able to use any of the truthful statements made by Banerjee to forward their own agenda against Alkek. . According to his own admission, John Hasset wanted to extract millions of dollars of compensation as he mentioned on a call on or about August 10, 2011. Ms. Akshita Gandhi-Banerjee who was present on the call along with Marc Susswein (Mr. Banerjee's counsel and partner of Liddle

and Robinson law firm in New York) were both witnesses to Hassetts blatant Abuse of Process (by demanding a favorable Affidavit) to extract financial gains from the investors.   Mr. Hassett went so far as to state the reasons why he has sued Mr. Banerjee --- since he wanted to extract tens of millions from Alkek, NCR, etc. and needed Mr. Banerjee to say that he colluded with the investors to dislodge Tuckerbrook from their role as Co-General Partner of the Funds with Mr. Banerjee.

31. The terms of the Settlement of June 2011 allowed for arbitration in the event that the Settlement was not consummated, again allowing for Tuckerbrook to extract an affidavit and documents that Tuckerbrook either did not have or obtain in the previous litigations with Alkek and Banerjee. The Supplemental Settlement Agreement is quoted below:

> *Banerjee shall produce to Tuckerbrook in native format all emails and attached documents (50+) in his possession, custody or control concerning or relating to Alkek, Tuckerbrook, the Tuckerbrook-SB Global Special Situations Fund, the Tuckerbrook-SB Global Distressed Fund....Banerjee **will answer Tuckerbrook's questions** with respect to the documents he delivered pursuant to paragraph 1 above and follow up questions to his deposition testimony fully, truthfully and candidly in an interview setting... **If requested, Banerjee shall provide an affidavit recounting such truthful and accurate information as Tuckerbrook may request.** (Emphasis added)*

Again another blatant attempt at obtaining new documents and a follow-on affidavit, demonstrating the continuing pattern of abuse of process. **The legal process itself, in this matter, is misused and used for illegal and malicious purposes.** All this had nothing to do with the filed complaint. It was a fishing expedition to extract information from Banerjee that Tuckerbrook could then use in their litigation against Alkek.

32. Again Tuckerbrook's actions were foiled because, Banerjee refused to fabricate lies and perjure himself. When the latest settlement (July 13, 2012) in the SB Litigation was not consummated, yet another attempt was made on July 21, 2012. Below is a portion of the new Settlement of July 21, 2012.

> *"Upon production of the Declaration and Documents described above, Tuckerbrook shall have two (2) days in which to state whether it may use the Declaration or any of the Documents in the **pending litigation with Alkek**. If the Declaration or any of the Documents constitute evidence that Tuckerbrook may offer or otherwise use in the Alkek litigation, and Tuckerbrook states that it accepts its rights to use the Declaration or any of the Documents by signing the "Accepted" line below, then the draft declaration shall be made into a sworn affidavit ("Affidavit"), ... [emphasis added].*

Hassett sent via email a list of questions to be answered by Banerjee in a Declaration/Affidavit so that the information gathered could be used against Alkek. The questions posed by Hassett had nothing to do with the SB Litigation but the Alkek litigation, again demonstrating the Plaintiff's abuse of process.

33. In Tuckerbrook's latest attempt (in January 2013, in this current case) demonstrates an abuse of process that is so unusual that it's rarely seen. Tuckerbrook wanted Banerjee to not aid Alkek (who seeded Banerjees funds) in the litigation in CT. In fact it amounted to more extortion. In latest "Supplemental Settlement Agreement", (sent in January 2013), Tuckerbrook demands that Banerjee forever give up his attorney-client privileges: (emphasis added)

> *Banerjee, ... **does irrevocably waive his right to asset the attorney-client privilege regarding his communications with his attorneys.... and further waives any right to assert any joint defense or common interest privilege or any other privilege whatsoever with regard to communications with attorneys** acting for any of the Alkek parties, the so-called "Steering Committee" .....Banerjee shall provide such other correspondence or written confirmation of his waiver of attorney-client privilege as required by such attorneys to testify in the litigation.*

34. Although Mr. Banerjee maintains that he has not been served with the complaint in this case, he has obtained a copy of the Complaint so as to defend himself against Tuckerbrook's claims. The complaints in the two cases, 11672 and the current 11643 are nearly identical.

35. This entire case (2009-2013) has been an exercise in trying to **harass and coerce a testimony and nonexistent evidence out of Mr Banerjee to be used by Tuckerbrook in the lawsuit filed against Alkek Foundation** (lead investor in the Funds managed by Banerjee and Tuckerbrook). As your Honor can see very quickly that this was **an abuse of process and malicious prosecution**. This abuse of process is against the Rules of Federal Civil procedure, Rule 11(b)(1)(2)(3) and as the Honorable Judge Young acknowledged in the Status Hearing that was held on June 27th, 2012.

     **Mr. Banerjee**: *…There's nothing in this. They just want information from me for another case.*

     **The Court:** *It sounds like, that sounds right to me….*

36. As mentioned previously, Tuckerbrook's latest attempt at yet another Supplemental Settlement Agreement (January 2013) to settle the litigation which is without merit, goes far into the realm of desperation; demanding Banerjee give up his attorney-client privileges with any and all lawyers that he has spoken to since the 2008 lawsuit began. As a basic construction in the judicial system, the privilege is an ancient device. Banerjee has refused to give up this fundamental right. Tuckerbrook, has stated that, they would use the documents in their pending litigation and expects to somehow miraculously find out some information (aka coerced Affidavit from Banerjee) that they have not yet found through all their previous nefarious actions.

## ARGUMENT

Counterclaim Defendant, Tuckerbrook, has moved this Court to dismiss Counterclaim Plaintiffs counterclaims pursuant to Fed. R.Civ. 8 (a)(2) for proffering insufficient pleadings and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Tuckerbrook continues to waste the Courts time with meritless and baseless Motions since Discovery and trial are needed to prove the meritorious Counterclaims of the Counterclaim Plaintiff. The Counterclaim Complaint also not only meets but exceeds the standards governing the form of a complaint contemplated by Federal Rule of Civil Procedure 8(a)(2) and Federal Rule of Civil Procedure 12(b)(6).

## I.   THE COMPLAINT COUNTERCLAIMS ARE SUFFICIENTLY STATED.

Tuckerbrook cites no valid authority to support the proposition of any supposedly missing ingredients are, in fact, required in the Counterclaim Plaintiffs Complaint. Federal Rule of Civil Procedure 8(a) states that a complaint should contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "[e]ach allegation must be simple, concise, and direct. Fed. R. Civ. 8(d)(1). The Supreme Court has explained that a complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *accord Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 568 n.15 (1987) (under Federal Rule 8, claimant has "no duty to set out all of the relevant facts in his complaint"). "Specific facts are not necessary in a Complaint; instead, the statement need only 'give the defendant fair notice of what the...claim is and the grounds upon which its rests." *Epos Tech.,* 636 F. Supp.2d 57, 63 (D.D.C. 2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007)).

Thus, the Federal Rules embody "notice pleading" and require only a concise statement of the claim rather than evidentiary facts. Accordingly, Tuckerbrook's Motion would be considered properly filed only "where a plaintiff's complaint is 'unintelligib[le] (sic),' not where a complaint suffers for 'lack of detail,'" *Epos Tech.,* 636 F. Supp. 2d at 63 (citations omitted). The simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and to dispose of unmeritorious claims. *See Swierkiewicz,* 534 U.S. at 512. Indeed the courts have found that if the information sought by the motion is obtainable through discovery, the motion (to dismiss) should be denied. *See, e.g. Towers Tenant Ass'n v. Towers Ltd. P'ship,* 563 F. Supp. 566, 569 (D.D.C. 1983) (denying motion for a more definite statement because details such as "dates, times, names and places" are "the central object of discovery, and need not be pleaded"). The Counterclaim Complaint actually has more than sufficient detail in each of the claims of the nature of violation – breach of contract and the damages resulting from the breach of violation of the 2011 Settlement Agreement (Complaint paragraph 37-38 and Count I: Breach of

Contract); Abuse of Process pleadings (Count II, Complaint Paragraph 21-24, 26-36, 39-41) have been clearly stated as required by Rule 8 (a)(2). Defamatory and disparaging statements (Complaint Paragraph 42-48) that undermine Mr. Banerjee's character that were made by Always (the Agents), Tuckerbrook and Tuckerbrooks counsel. Mr. Banerjee also provided the Formal Investigative Report filed with the Police against Tuckerbrooks' agents. In addition, two Affidavits are attached (**Exhibit A**) (more information will be found and available during Discovery against Always (a Security firm that provides nefarious characters to intimidate and threaten) and Tuckerbrook that were filed in a previous filing (withdrawn due to Counsels advice due to technical issues since Mr. Banerjee was *pro se* when he filed the previous complaint against Tuckerbrook in 2010). Mr. Banerjee has given notice of the violation, as required by Rule 8 for Count I-II (Tuckerbrook even admits that Count I is meritorious but tries to come up with specious arguments not supported either by fact or by law against Count I and II) and Count III: Defamation and Disparagement against Tuckerbrook. As far as Count IV, Counts I-III show violations of MGL Ch. 93A and Complaint Paragraph 49 clearly states the pleading and gives Tuckerbrook notice as required by Rule 8. Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint need only set forth a "short and plain statement" that gives a defendant fair notice of plaintiff's grounds for entitlement for relief. Fed. R. Civ. P. 8(a)(2). *See Farmer v. Countrywide Financial Corp.*, 2009 U.S. Dist. LEXIS 49553 at *5 (C.D. Calif. 2009) ("ordinary pleading rules are not meant to impose a great burden upon a plaintiff")' *citing Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346(2005).

Plaintiff's Complaint meets the "notice pleading" requirements for Fed. R. Civ. P. Rule 8 whereby pleadings must contain only short and plain statements sufficient to put the defendants on notice of the claims against them. *See, Sams v. United Food and Commercial Workers International Union*, 866 F.2d 1380. 1384 (11th Cir. 1989) (complaint need not specify in detail precise theory of recovery, but must put opponents on notice of claims or defenses asserted); *Little v. City of North Miami*, 805 F.2d 962, 969 (11th Cir. 1986) (complaint which stated that the defendant degraded the plaintiff was adequate to plead a claim of injury to business reputation). Courts have liberally interpreted Fed. R. Civ. P Rule 8 to require that a

plaintiff be given an opportunity to proceed even if his or her claim is "in artfully stated". *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981).

The Counterclaim Plaintiff in his Counterclaim complaint specifically sets out a short and plain statement describing each of its claims and theories of recovery. This is all that is required under Rule 8. The defendants' arguments to the contrary, including its attempts to introduce additional evidence outside the complaint such as attaching Judge Hillman's Arbitration findings (which were not based on perjury standards but some "other" standards).

Counterclaim Defendant, Tuckerbrook, argues speciously that the claims are insufficient based on 8(a)(2). On the contrary, the Counterclaims go well beyond the requirements of Rule 8 and include sufficient detail (with Affidavits) and are more than fully compliant. Here, Counterclaim Plaintiffs Complaint is "not unintelligible or confusing" and does not violate Federal Rule of Civil Procedure 8(a)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." The Complaint clearly has a more than sufficient statement of the claim and more than meets the requirement that it be "short and plain." For example, the Complaint specifically identifies the actions of Counterclaim Defendants and how those actions are wrongful. Finally, the Complaint clearly puts Defendants on fair notice of the charges against them with Counts I-IV (Paragraph 37-49). So as shown the Counterclaim Plaintiff clearly exceeds the standards of rule 8(a)(2). Counterclaim Defendants have not offered any evidence from the face of the complaint that the facts as alleged in plaintiff's Complaint would not entitle plaintiff to relief and would not rise to the level of a short and plain statement under Fed. R. Civ. P. Rule 8.

## II.   THE COUNTERCLAIM PLAINTIFF HAS CERTAINLY STATED A  CLAIM :

Motions to dismiss for failure to state a claim under Fed. R. Civ. Procedure, Rule 12 (b)(6) are viewed with disfavor, and accordingly, dismissals for failure to state a claim are "rarely granted" *Gillian v. Jamco Dev Corp.*, 108 F. 3d 246, 249 (9th Cir. 1997) (citation omitted). In deciding a motion to dismiss, the court must accept as true allegations of the complaint and draw reasonable inferences in the plaintiff's favor. *Doe v.*

*United States,* 419 F.3d 1058, 1062 (9th Cir. 2005). Inquiry into the adequacy of the evidence is improper. *Enesco Corp. v. Price/Costco, Inc.,* 146 F.3d 1083, 1085 (9th Cir. 1998). A court may not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

A motion to dismiss a complaint for failure to state a claim tests the legal sufficiency of the complaint; all facts pleaded and all reasonable inferences from those facts are admitted as true, but only for the purpose of testing the legal sufficiency of a claim, not for trial. *Scottv. Savers Property and Cas. Ins. Co.,* 663 N.W.2d 715, 262 Wis. 2d 127 (2003). "A complaint will be dismissed only if it appears certain that no relief can be granted under any set of facts that the plaintiffs might prove in support of their allegations." *Id.* "When standing is challenged on the basis of the pleadings, [courts] accept as true all material allegations of the complaint, and ...construe the complaint in favor of the complaining party." *Town of Eagle v. Christensen,* 191 Wis.2d 301, 316, 529 N.W.2d 245 (Ct. App 1995). Moreover, pleadings filed by *pro se* [litigants] are "held to less stringent standards than formal pleadings drafted by lawyers..." *Haines v. Kerner, 404* U.S. 519 (1972). This means that, in deciding a Rule 12(b)(6) motion against a *pro se* plaintiff, the court is supposed to look even more carefully to see whether any set of facts consistent with the complaint could be proven, and if so, to deny the Rule 12(b)(6) motion.

 In evaluating a Rule 12(b)(6) motion, the court should "construe  the complaint in the light most favorable to the [counterclaim] plaintiff, taking all . . . allegations as true and drawing all reasonable inferences from the complaint in [plaintiff's] favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). *See also al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009), *citing Newcal Indus., Inc., v. Ikon Office Solutions*, 513 F.3d 1038, 1043 n. 2 (9th Cir. 2008). The Supreme Court recently explained that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct.

at 1949, *quoting Twombly*, 550 U.S. at 556. Counterclaim Plaintiff meets or even exceeds this standard in the filing of his Counterclaim.

When deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded factual allegations of the complaint and draw all inferences in favor of the pleader. *See City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493 (1986); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). ─The complaint is deemed to include any written instrument attached to it as an exhibit or any statement or documents incorporated in it by reference.l *Cortec Indus., Inc. v. Sum Holdings L.P.,* 949 F.2d 42, 47 (2d Cir.1991). The Court also may consider ─matters of which judicial notice may be taken.l *Leonard T. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir.1999).

Motions to dismiss test the sufficiency of the complaint; in evaluating them, the court should consider only the pleading itself and matters of which judicial notice can properly be taken. *Peck v. Hoff,* 660 F. 2d 371, 374 (8th Cir. 1981); *North Star Int'l v. Arizona Corp, Commission,* 720 F. 2d. 578, 581 (9th Cir 1983); *Hovsepian v. Apple, Inc.* 2009 U.S. Dist. LEXIS117562, at *5 (N.D. Cal 2009); *Fullmer v. JP Morgan Chase Bank, NA,* 2009 U.S. Dist. LEXIS 105999, at *4-5 (E.D. Cal 2009). A motion to dismiss is not the appropriate vehicle for resolving disputed evidentiary contentions.

The dismissal of a lawsuit pursuant to Fed. R. Civ. P. Rule 12(b)(6) shall **only** be granted if the plaintiff can prove no set of facts consistent with the allegations which can entitle plaintiff to relief. *Hishon v. King & Spauling*, 467 U.S> 69, 73, 104 S. Ct. 2229, 2232 (1984); *Conley v. Gibson,* 355 U.S> 41, 78 S. Ct. 102-102 (1957); *Stone Mountain Game Ranch, Inc. v. Hunt,* 746 F.2d 761 763, n. 4 (11th Cir. 1984); *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505, 506 (5th Cir, 1971).

Counterclaim Defendants in this case do attempt to argue that additional evidence would support an affirmative defense in the instant case. This evidence should either be stricken from the record by the court. Pages 6-14 of the Defendants' motion are arguments of law which are clearly improper in a Fed. R. Civ. P. Rule 12(b)(6) motion. These arguments address the merits of the claims rather than the sufficiency of the

claims as alleged. The Court may only consider what is within the "four corners" of the pleading when considering a Fed. R. Civ. P. Rule 12 (b)(6) motion. The Counterclaim Plaintiff's complaint not only delineates the requisite elements of all counts against the Defendants but also states the conduct, the motive and the intent of the Counterclaim defendants for all the Counter Claims.

Dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate only when the complaint does not give a defendant fair notice of a legally cognizable claim and the basis on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff must plead facts showing that a violation is plausible, not just possible. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (*citing Twombly*, 550 U.S. at 555). In considering whether the complaint is sufficient to state a claim, a court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986).

Under Federal Rule 12(b)(6), the Court must deny the Defendants' motion to dismiss unless the Defendant demonstrates "beyond doubt that the [plaintiff] can prove no set of facts in support of [its] claim that would entitle [it] to relief." Flood v. New Hanover County, 125 F.3d 249, 251 (4th Cir.1997). In making this determination, the Court must also "accept the factual allegations in the [plaintiff's] complaint as true, and must construe those facts in the light most favorable to the Plaintiff." Id.

When deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded factual allegations of the complaint and draw all inferences in favor of the pleader. *See City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493 (1986); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993). —The complaint is deemed to include any written instrument attached to it as an exhibit or any statement or documents incorporated in it by reference. *Cortec Indus., Inc. v. Sum Holdings L.P.*, 949 F.2d 42, 47 (2d Cir.1991). The Court also may consider —matters of which judicial notice may be taken. *Leonard T. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir.1999).

The Rule 12(b)(6) test has been revised in recent years. In *Conley v. Gibson*, 355 U.S. 41 (1957), the Supreme Court stated the interplay between Rule 8 (pleading) and Rule 12(b)(6) as follows: "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46. In *Bell Atlantic Corporation v. Twombly*, 55 U.S. 544 (2007), the Court noted questions raised regarding the "no set of facts" test and clarified that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," id. at 563. It continued: "Conley, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." Id.

Where a complaint is inadequate, leave to amend the complaint is common. *See, e.g., Butt v. United Brotherhood of Carpenters & Joiners of America*, No. 09–4285, 2010 WL 2080034 (E.D. Pa. May 19, 2010).

As demonstrated above, the Counterclaim Defendants' motion cannot survive the application of these standards. In all the Counts –I-IV in the Counterclaim Plaintiffs Counterclaim, the claim is clearly stated and so are the damages. The filing clearly describes in Count I, the Breach of Contract with the Counterclaim defendant owing monetary damages of $12,500 to the Counterclaim Plaintiff. The claim is clearly stated and described in Complaint Paragraph 37-38. The Counterclaim Defendant, in another misguided and blatant attempt to continue with its bullying tactics wants to set off against the current case – but is clearly in breach of the 2011 Settlement Agreement. It should be held in escrow till trial. In Count II, Abuse of Process Claim is clearly stated in great detail in Complaint Paragraph 39-41 and 23-24 and 26-36. Tuckerbrook would like to argue incorrectly in a Rule 12 (b)(6) the merits of the claim and would like the Court to believe that the Counterclaim Plaintiff has brought the claim incorrectly (since Tuckerbrook, the now defunct Company due to various lawsuits) by complaining about the lawsuit and deposition and the process servers (really hired killers) – the reality is that they want to hide the fact clearly stated in the Abuse of Process Claim that they have used this lawsuit to intimidate, threaten the Counterclaim Plaintiff

19

and use it as a financial club to extract a favorable Affidavit (which needs to say that Banerjee colluded with the Investors such as Alkek to dislodge Tuckerbrook from their co-General Partner role with Banerjee) so they could prevail in their lawsuit against Alkek and collect "tens of millions of dollars from Alkek or NCR" as John Hasset stated in a conference in presence of Marc Susswein (Banerjee's counsel and partner of law firm Liddle and Robinson based in New York) and Mr. Banerjees' spouse in a call on or about August 10, 2010. Also, Banerjee has clearly stated the damages in this claim in paragraph 41. As far as Count III, Defamation and Disparagement, is concerned the claim and damages are stated in Paragraph 42-48 and Affidavits are attached as well. Count IV, MGL Ch 93A, Unfair and deceptive Trade Practices, is rampant throughout the Complaint from Paragraph 18-49 and shows that the Counterclaim Plaintiff has been harmed.

## CONCLUSION

In short, the Counterclaim Plaintiffs Complaint fully complies with the pleading requirements of Federal Rule of Civil Procedure 8(a) and provides Defendants fair notice of the charges against them and the grounds therefor. Discovery and argument will add further detail later; in fact, much supporting factual material was provided by Counterclaim Plaintiff in materials filed with the Counterclaim. Additionally, the Counterclaim Plaintiff has sufficiently alleged harm. Accordingly, for the reasons set forth herein, The Counterclaim Plaintiff respectfully requests that the Court deny Counterclaim Defendants' Motion to Dismiss the Complaint with Prejudice and Order the Counterclaim Defendants to Answer the Counterclaims and then proceed to Discovery and Trial. The Court may also grant the *pro se* Counterclaim Plaintiff leave to amend the Complaint if needed pursuant to Fed Civ. Code Rule 15.

Respectfully submitted, September 19, 2013

Sumanta Banerjee
Pro Se Litigant
58/1 Ballygunje Cir Rd
Kolkata-19 West Bengal
India